## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **NONGUIDELINE MISDEMEANOR** |
| | ) | **PRESENTENCE INVESTIGATION REPORT** |
| | ) | |
| | ) | |
| | ) | **Docket No.:   0090 1:21CR00456-001** |
| **Brian E Stenz** | ) | |
| | ) | |

**Prepared for:**      Beryl A. Howell
                              Chief United States District Judge

**Prepared by:**      Crystal S. Lustig
                              Senior United States Probation Officer
                              (202) 565-1425
                              crystal_lustig@dcp.uscourts.gov

**Assistant U.S. Attorney**                          **Defense Counsel**
Grace  Albinson                                      Joseph  Marrone
150 M Street, N.E.                                   200 S. Broad Street
Washington, DC 20002                                 Suite 400
202-616-3311                                         Philadelphia, PA 19102
grace.e.albinson@usdoj.gov                           215-732-6700
                                                     jmmcourtnotice@marronelaw.com

                                                     Kira Anne West
                                                     1325 G Street, NW
                                                     Suite 500
                                                     Washington, DC 20005
                                                     (202) 236-2042
                                                     kiraannewest@gmail.com

**Sentence Date:**      February 17, 2022, at 9:30 AM

**Offense:**          Count 4:      Parading, Demonstrating, or Picketing in a Capitol
                                    Building
                                    40 USC § 5104(e)(2)(G)
                                    6 months imprisonment/$5,000 fine

**Release Status:**      Arrested on April 30, 2021 in the Eastern District of Pennsylvania and
                          released on personal recognizance. Initial appearance (via video) in the
                          US District Court for the District of Columbia on May 5, 2021 and
                          placed on personal recognizance.

**Date Prepared:**      December 27, 2021          **Date Revised:**      January 20, 2022

**Detainers:**     None.

**Codefendants:**  None.

**Related Cases:** None.

**STENZ**, Brian E.                                                                                          **Page 3**

**Identifying Data:**

| | |
|---|---|
| **Date of Birth:** | March 12, 1970 |
| **Age:** | 51 |
| **Race:** | White |
| **Hispanic Origin:** | Non-Hispanic origin |
| **Sex:** | Male |



| | |
|---|---|
| **SSN#:** | 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 |
| **FBI#:** | 778132LA1 |
| **USM#:** | 42744-509 |
| **State ID#:** | Pennsylvania State ID#: PA19448801 |

**PACTS#: 7636463**

| | |
|---|---|
| **Marital Status:** | Married |
| **Education:** | Graduate Equivalency |
| **Dependents:** | 0[1] |
| **Citizenship:** | U.S. Citizen |
| **Country of Birth:** | United States |

| | |
|---|---|
| **Legal Address:** | 3110 Sycamore Lane, East Norriton, Pennsylvania  19401 |
| **Residence Address:** | 3110 Sycamore Lane, East Norriton, Pennsylvania  19401 |
| **Telephone#:** | (484) 840-6978 (cellular) |

| | |
|---|---|
| **Alias(es):** | True Name: Brian Edward Stenz, Sr. |
| | Michael Stoffire [per NCIC] |

| | |
|---|---|
| **Alternate IDs:** | Eastern District of Pennsylvania PACTS#: 7497973 |
| | Pennsylvania Commercial Driver's License#: 22271578 |

**Restrictions on Use and Redisclosure of Presentence Investigation Report.**  Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

---

[1] Based on IRS Publication 501 definition for dependent(s) to include qualifying child or relative. All identified children, whether or not a dependent of the defendant, are included in Part C of this report.

## PART A. THE OFFENSE

### Charge(s) and Conviction(s)

1. On July 8, 2021, the United States Attorney for the District of Columbia filed a four-count Information charging Brian E. Stenz with Entering and Remaining in a Restricted Building, in violation of 18 USC § 1752(a)(1), as to Count One; Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 USC § 1752(a)(2), as to Count Two; Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 USC § 5104(e)(2)(D), as to Count Three; and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 USC § 5104(e)(2)(G), as to Count Four.

2. The Information does not provide notice to the defendant the Government intends to seek forfeiture as a part of the sentence.

3. The criminal conduct charged in the Information, as to all counts, occurred on January 6, 2021.

4. On November 12, 2021, the defendant pled guilty to Count Four of the Information, pursuant to a written plea agreement. The defendant understands that a conviction for Count Four carries a maximum sentence of six months imprisonment, pursuant to 40 USC §5109(b); a fine of not more than $5,000, pursuant to 18 USC §3571(b)(6); and an obligation to pay any applicable interest on penalties on fines and restitution not timely made. The defendant also agreed to pay a special assessment of $10.

5. Mr. Stenz agreed to allow law enforcement agents to review any social media accounts operated by the defendant for statements and postings in and around January 6, 2021 and conduct an interview of him regarding the events in and around January 6, 2021, prior to sentencing. In exchange for his guilty plea, the government agreed to request that the Court dismiss the remaining counts of the Information at the time of sentencing.

6. The defendant acknowledged that the sentence in this case will be determined by the Court, pursuant to the factors set forth in 18 USC §3553(a). The defendant further understands that a conviction for Count Four is a Class B misdemeanor. Accordingly, pursuant to §1B1.9 of the US Sentencing Guidelines, the sentencing guidelines do not apply to the defendant's sentencing.

7. The defendant acknowledged that the riot that occurred on January 6, 2021, caused, as of May 17, 2021, approximately $1,495,326.55 in damages to the United States Capitol. The defendant agreed to pay restitution to the Architect of the Capitol in the amount of $500.

8. Pretrial Services Agency of the District of Columbia (PSADC) records indicate the defendant has complied with all Court ordered conditions of release.

### The Offense Conduct

9.    The United States Capitol, which is located at First Street, SE, in Washington, DC., is secured 24 hours a day by United States Capitol Police. Restrictions around the US Capitol include permanent and temporary security barriers and posts manned by US Capitol Police. Only authorized people with appropriate identification are allowed access inside the US Capitol.

10.   On January 6, 2021, the exterior plaza of the US Capitol was closed to members of the public.

11.   On January 6, 2021, a joint session of the United States Congress convened at the US Capitol, which is located at First Street, SE, in Washington, DC. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the US Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

12.   As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the US Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the US Capitol building, and US Capitol Police were present and attempting to keep the crowd away from the US Capitol building and the proceedings underway inside.

13.   At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and officers of the US Capitol Police, and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by US Capitol Police Officers or other authorized security officials.

14.   At such time, the certification proceedings were still underway and the exterior doors and windows of the US Capitol were locked or otherwise secured. Members of the US Capitol Police attempted to maintain order and keep the crowd from entering the US Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the US Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the US Capitol, requiring the expenditure of more than $1.4 million dollars for repairs.

15.   Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous

circumstances caused by the unlawful entry to the US Capitol, including the danger posed by individuals who had entered the US Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the US Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

<u>Brian E. Stenz's Participation in the January 6, 2021 US Capitol Riot</u>

16.     On January 6, 2021, defendant Brian E. Stenz and his friend from his neighborhood attended the "Stop the Steal" rally and then marched to the US Capitol.

17.     At approximately 2:43 p.m., Mr. Stenz and his friend entered the US Capitol through the Senate Wing door, and walked around the US Capitol Building for approximately eight minutes.

18.     Following the riot, the defendant sent a series of photographs via text message to several individuals. One of the photographs showed Mr. Stenz and his friend inside the US Capitol Building on January 6, 2021. Other photographs were of various areas inside the US Capitol, including the Crypt, and the office of Senator Jeff Merkley.

19.     On April 6, 2021, the defendant was interviewed by law enforcement. He admitted that he entered the US Capitol and that he used his phone to take photographs in and around the US Capitol Building.

20.     Defendant Stenz knew at the time he entered the US Capitol Building that he did not have permission to enter the building and he paraded, demonstrated, or picketed inside the building.

**Victim Impact**

21.     In consideration of 18 USC § 3663 and 18 USC § 3663A, the Court is authorized to impose restitution under the terms of a plea agreement. This offense involved a large crowd of individuals who gathered outside the US Capitol, some of whom ultimately forced entry inside the building. Those individuals' actions included, but are not limited to, breaking windows, damaging property, and assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The incident resulted in substantial damage to the US Capitol, requiring the expenditure of approximately $1,495,326.55 in repairs, as of May 17, 2021. In this case, the defendant has agreed to pay $500 toward restitution, payable to the Architect of the Capitol.

**Defendant's Statement**

22.     Mr. Stenz agreed with the Statement of Offense he signed prior to his guilty plea. He provided the following written statement:

"I attended the Trump Rally on January 6th and after the speech ended I was headed to the train station but then I saw a crowd moving towards the capitol. I went to the top with the crowd. A lot of people were entering the building. I then entered knowing that I should not. I remained inside for about 8 minutes and took some pictures. Once I saw all the destruction and chaos going on inside I left the building and took the train back home. I was overwhelmed with mixed feelings and once I saw the FBI on the news advising me to turn myself in. I was ashamed of my actions and decided to contact my attorney to turn myself in. I regret the stain on history my actions caused everyone."

### Offense Level Computation

23.     Count Four: Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 USC § 5104(e)(2)(G)

24.     Pursuant to USSG §1B1.9, the US Sentencing Guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an infraction. Accordingly, the US Sentencing Guidelines do not apply to this count.

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

### Juvenile Adjudication(s)

25.     None.

### Adult Criminal Conviction(s)

| | Date of Arrest | Conviction/Court | Date Sentence Imposed/Disposition |
|---|---|---|---|
| 26. | 02/01/1990 (Age 19) | Ct. 1) Drive Under the Influence Ct. 2) Accident Involving Damage to Unattended Vehicle Ct. 3) Fail to Notify Police Department of Accident Ct. 4) False Reports Ct. 5) Reckless Driving Ct. 6) Public Drunkeness Court of Common Pleas, Montgomery Co., PA (CP-46-CR-0001623-1990 | 09/18/1990: 1 year probation, placed in the Accelerated Rehabilitation Disposition (ARD); 40 hours community service |

The defendant was represented by counsel.

According to the criminal complaint, on February 1, 1990, at 805 Spring Mill Avenue, Conshohocken, Pennsylvania, police arrived at the scene of a hit and run. The struck vehicle was a red Mazda. A witness described the striking vehicle as light in color with damage to the front right corner, and the right headlight and turn signal were hanging down. Police officers found the striking vehicle abandoned in an alleyway, heavily damaged with red paint on the front right corner. The defendant came from around the corner of the property and began walking side to side towards the vehicle. Police officers reported that the defendant's speech was impaired, and he smelled like alcohol. The defendant denied being the owner of the vehicle and claimed the vehicle belonged to someone else. The defendant then left the scene. Police officers later found documentation in the vehicle confirming the defendant as the owner of the vehicle. Police officers placed the defendant in custody when he admitted he was driving the vehicle after having drinks at a friend's house, hit another vehicle, and drove off.

Institutional Adjustment: Not applicable.

Supervision Adjustment: According to Montgomery County Clerk of Courts Office, there is no documentation confirming the defendant completed the ARD. Montgomery County Adult Probation reported that the file has been archived in their system, but that the ARD was most likely completed because the defendant does not have an outstanding balance and ARD was not revoked.

| 27. | 04/22/1999 (Age 29) | Ct. 1) Possess Marijuana Ct. 3) False Report to Law Enforcement Court of Common Pleas, Montgomery Co., PA (CP-46-CR-0002758-1999) | 08/04/1999: Ct. 1) 3 months probation Ct. 3) 1 year imprisonment, $813.10 fine, $462.82 costs |
| --- | --- | --- | --- |

The defendant was represented by counsel.

Additional charges of False Report to Law Enforcement were nolle prossed.

According to information received from the US Probation Office for the Eastern District of Pennsylvania, details of the offense are not available due to the age of the case.

Institutional Adjustment: Not available.

Supervision Adjustment: Not available.

| 28. | 10/20/2006 (Age 36) | Ct. 1) Stalking - Repeated Communication to Cause Fear Ct. 2) Harassment - Communicate Lewd, Threatening Language Court of Common Pleas, Montgomery Co., PA (CP-46-CR-0008621-2006) | 10/05/2007: Ct. 1) 3 years probation Ct. 2) 1 year probation, to run consecutively, $300 fine, $1,824 costs |
| --- | --- | --- | --- |

The defendant was represented by counsel.

Additional charges of Harassment were nolle prossed.

According to the Affidavit of Probable Cause, on October 5, 2006, the defendant's neighbors reported him for ongoing harassment. They reported that on August 12, 2006, the defendant was playing loud, obscenity-laced music for eight hours. The defendant's neighbor, DW, approached the defendant and asked him to turn down his music. The defendant responded by spitting in DW's face. On August 14, 2006, the defendant was playing loud, obscenity-laced music. Police officers responded and issued a citation. On August 22, 2006, the defendant was on his porch, yelling, "fucking cunt," to his neighbor, LW, who was seated on her porch. On September 9, 2006, the defendant was issued a citation for harassment. The defendant had been calling LW a "fucking cunt" every time she left her home. On September 11, 2006, the defendant was issued a citation for harassment. The defendant was on his porch, yelling at LW, calling her a "fucking cunt," "bitch," and "whore." On October 4, 2006, the defendant was heard operating a leaf blower, in the dark, at approximately 8:30pm. LW exited her home to see what the defendant was doing. The defendant began calling LW a "fucking cunt" and other foul words. At approximately 10:50pm, the defendant was heard screaming obscenities. The defendant yelled, "Hey tough guy, you gonna stay up all night to catch me driving, you fucking rat, mother fucking rat, you stupid motherfucker. I spit right in your mouth, but you didn't swallow like your wife does. You fucking rat. Go ahead and keep leaving your wife home alone. Maybe I'll keep those home fires burning, maybe your house will burn down."

DW and LW told police they no longer felt safe in their home because of the defendant. They feared that the defendant would escalate to physical confrontation.

Institutional Adjustment: Not applicable.

Supervision Adjustment: As special conditions of probation, the defendant was ordered to have no contact with David and Leah Wilson and participate in anger management.

| 29. | 08/15/2017 (Age 47) | Obstruction of Emergency Services Court of Common Pleas, Montgomery Co., PA (CP-46-CR-000798-2018) | 06/15/2018: 1 year probation, $1,158.50 costs |
|-----|---------------------|-----|-----|

The defendant was represented by counsel.

Additional charges of Reckless Endangerment, Resist Arrest, Disorderly Conduct, and Violate Controlled Substance Act were nolle prossed.

According to the Affidavit of Probable Cause, on May 13, 2017, the East Norriton Township Police Department responded to a noise complaint at 3110 Sycamore Lane, East Norriton, Pennsylvania. The defendant was revving the engine of a Harley Davidson motorcycle in his garage. Moments later, the complainant reported that the motorcycle and garage had caught on fire. Officer Shannon reported to the scene and found the garage and house on fire; the defendant's daughter asked for help and told the officer that the defendant was in the house. The officer found the defendant in the rear bedroom and dragged him outside of the house, into the backyard. The defendant ran back into the house, into the rear bedroom. The officer dragged the defendant out of the house and into the backyard again. The defendant ran back towards the house, stating he was trying to get something, but the officer was able to stop the defendant from entering the home. The officer dragged the defendant to the side yard and two males helped carry the defendant to the ambulance.

A second officer arrived at the scene and observed the defendant had serious burns on his face, head, shoulders, back, and chest. The defendant also had black mucus coming from his mouth and nose. Based on the defendant's behavior and prior incidents, the officer believed the defendant had been under the influence of alcohol and/or a controlled substance. Medics on the scene deemed the defendant a trauma patient in need of immediate medical attention, but the defendant refused help and pushed the medics away. The defendant was put onto a stretcher and put into an ambulance. The defendant continued to be combative towards the medics inside the ambulance. The medics administered a sedative and transported the defendant to the hospital.

Once the fire was extinguished, the fire marshal and police detective began an investigation. They found several beer bottles in the garage and rear bedroom. The fire marshal found a small pile of an off-white powder, later identified as a mixture of Phendimetrazine and Phentermine, next to a rolled-up dollar and the defendant's driver's license in the rear bedroom.

On May 15, 2017, the fire marshal and detective met with a witness who had cell phone and home surveillance video of the fire. The video shows the fire started because of the defendant revving his motorcycle for an ongoing period. The defendant is seen entering the home and exiting with blankets. The defendant tries putting the fire out with the blanket but is unsuccessful. The defendant re-entered the home and exited with more blankets

several times before the garage fully caught fire. The defendant was last seen entering the home, despite pleas from his children and neighbors.

The investigation determined that while the defendant did not purposefully start the fire, his actions were still reckless and placed occupants, police officers, and firefighters in extreme danger by failing to report the fire to emergency services, attempting to extinguish the flames himself while under the influence, and ignoring Officer Shannon's lawful commands.

Institutional Adjustment: Not applicable.

Supervision Adjustment: Not available.

| | | | |
|---|---|---|---|
| 30. | 01/19/2018 (Age 47) | Unsworn Falsification to Authorities Court of Common Pleas, Montgomery Co., PA (CR-0007223-2019) | 01/21/2021: 1 year probation, $1,059 costs |

The defendant was represented by counsel.

An additional charge of Sale or Transfer of Firearms was nolle prossed.

According to the Affidavit of Probable Cause, on January 19, 2018, at Insight Firearms located at 2101 West Main Street, West Norriton, Pennsylvania, the defendant attempted to purchase a Smith & Wesson Bodyguard .380 caliber pistol by making false statements. The attempted purchase was denied.

When asked, "Have you ever been convicted in any court of a felony, or any other crime for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation," (Firearms Transaction Record, ATF Form 4473, Question 11C) the defendant answered "no" and signed, certifying his answers were true and correct. When asked, "Are you charged with, or have you ever been convicted of a crime punishable by imprisonment for a term exceeding one year? This is the maximum sentence that you 'could have received', not the actual sentence you did receive," (PSP Application/Record of Sale Form, SP 4-113, Question 32) the defendant answered "no" and signed, certifying his answers were true and correct. The defendant has a prior conviction for stalking, which is a 1st degree misdemeanor, making the previous two statements false.

Institutional Adjustment: Not applicable.

Supervision Adjustment: According to records of the Montgomery County Adult Probation Office, the defendant's probation is scheduled to expire on January 21, 2022. It was noted that he is compliant with the terms of his supervision.

### Criminal History Computation

31.    Pursuant to USSG §1B1.9, the sentencing guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an infraction.

### Traffic Infractions – Excluded Convictions

| 32. | 04/21/2020 (Age 50) | Disregard Traffic Lane (TR-00835-2020) | <u>01/19/2021</u>: Guilty, $245 fine and costs |
|---|---|---|---|
| | | Driving at Safe Speed (TR-00836-2020) | |
| | | Careless Driving (TR-00837-2020) | |
| | | Magisterial District Court, Montgomery Co., PA | |

Attorney representation is unknown; however, Pennsylvania State Law Rule 316, adopted November 29, 1972, requires the assignment or knowing waiver of counsel for all indigent defendants. Information pertaining to this arrest and disposition was taken from automated records of The Unified Judicial System of Pennsylvania. No other information was available.

33.    Accurint records showed that on October 24, 2013, the defendant was cited in Pennsylvania for Operate/Permit Operation with Unsafe Equipment, in Magisterial District Court Docket No. TR-0003300-2013. He entered a guilty plea on November 1, 2013.

34.    Accurint records showed that on June 12, 2016, he was cited for Stand Unattended in Pennsylvania, Magisterial District Court Docket No. TR-1669-2016. He entered a guilty plea on June 20, 2016.

35.    Accurint records indicated that on September 19, 2017, he was cited for Exceeding Meter Limit in Magisterial District Court Docket No. TR-003563-2017. He pled guilty on November 28, 2017.

### Other Criminal Conduct

36.    Accurint records showed that the defendant was cited for several offenses in North Carolina; however, the dates of offense, jurisdictions, and dispositions are not listed.

37.    Accurint records also indicated that on August 8, 2012, the defendant was charged with Disorderly Conduct in Magisterial District Court in Pennsylvania, Docket No. NT-000356-2012. It was noted that he entered a guilty plea on November 20, 2012. This offense was not located in online records of The Unified Judicial System of Pennsylvania.

### Pending Charges

38.    None.

### Other Arrests

39.    None.

## PART C. OFFENDER CHARACTERISTICS

### Personal and Family Data

40.    The information contained in this section was obtained during a telephone interview with the defendant on November 23, 2021, and verified by his mother and wife on December 21, 2021.

41.    Brian Edward Stenz, Sr. was born on March 12, 1970[2] in Delaware County, Pennsylvania. He is the eldest of five children born to the marriage of Edward and Jessica Stenz (nee: McConnell). The defendant's father died in 2015 after suffering from angiosarcoma. He was 74 years old at the time of death and was employed as a revenue collector. He was also retired from the United States Air Force Reserve. The defendant's mother is 72 years old and resides in Trappe, Pennsylvania. She is a Registered Nurse (RN) and is the Clinical Educator at a long-term care facility.

42.    The defendant has four siblings. Sharon Stenz, age 50, resides in Norristown, Pennsylvania. She is employed as a housekeeper. Bradley Stenz, age 48, resides with his mother in Trappe, Pennsylvania and is a warehouse worker. Mr. Stenz indicated that his brother suffers from Asperger syndrome. Christy Fluri, age 42, resides in Phoenixville, Pennsylvania and is a homemaker. Nancy Stenz, age 41, resides in Wilmington, Delaware and works part-time at Trader Joe's.

43.    Mr. Stenz was reared in an intact family in East Norriton and Lafayette Hills, Pennsylvania. He indicated that during his formative years, his father worked to support the family and his mother remained in the home to care for the children. When the defendant was in high school, his mother returned to school to become a nurse. He noted that he was provided with all material necessities. He stated, "I didn't have everything I wanted, but I had everything I needed." The defendant noted that the family resided in a "nice area" and his parents "did the best they could."

44.    The defendant described his father as a "functioning alcoholic" but noted that his father went to work every day and was never violent. He stated, "He was always working." He advised that his sister, Sharon, has also struggled with substance abuse issues over the years. The defendant's mother noted that Sharon has been in recovery for the past four or five years and is "doing great." Mr. Stenz reported that he experienced a normal, happy childhood. He did not report any significant or traumatic events during his formative years

---

[2] The defendant provided a copy of his Pennsylvania Certificate of Birth, #0354690-1970.

and denied instances of physical abuse or neglect. He noted that he maintains regular contact with his mother and stated, "If she needs me, I'm there."

45.    In 1987, the defendant began dating his wife, Carla Stenz (nee: Zameska). The couple married on February 19, 2005, in Norristown, Pennsylvania. Mrs. Stenz is the Director of Nursing for a long-term care facility. The defendant indicated that they have "an excellent marriage" and have remained supportive of each other through the "ups and downs."

46.    They have three children. Brianna Stenz, age 26, resides in Pottstown, Pennsylvania and is a Registered Nurse. Kayla Stenz, age 22, is a senior at LaSalle College. She is due with her first child in February 2022. The defendant noted that she is on the Dean's List there. Brian Stenz, Jr., age 20, resides with the defendant and is a plumber's apprentice. Mr. Stenz indicated that his children are in good health.

47.    The Probation Office contacted the defendant's wife and she was able to verify the biographical information provided by the defendant. She noted that the defendant is a "good guy" and a "hard worker" who "loves his family more than anything." She commented that he "put his life on the line" for them during a house fire in 2017 when he kept returning to the burning house because he thought that she and her daughter were still inside. She stated, "We have always believed that family should stay together. He has made mistakes and is trying to put it behind him. He's my rock. I know that he is very sorry, embarrassed, and ashamed of this. He knows that it's a stain forever. He is not that person."

48.    The defendant's mother was able to verify the biographical information provided by the defendant. She described their family as being "very tight-knit." Regarding the defendant, she commented, "His kids love him. He's going to be a grandfather in February 2022. I know that he didn't go to Washington, DC with any intent to do what he did. He went to listen to Donald Trump. He then walked up to the Capitol and unfortunately went in. He's never been a troublemaker." Additionally, she stated, "I'm really sorry it happened and we're all praying for a good outcome for him. We're praying he won't go to jail. We are a very diverse family with diverse political beliefs. He walked into something stupid." Mrs. Stenz noted that the defendant has been the "father figure" in the family since the death of his father.

49.    The defendant resided in East Norriton, Pennsylvania until 1977. At that time, his father changed jobs and the family relocated to Lafayette Hills, Pennsylvania. The defendant remained there until age 16 and then moved to Chincoteague Island, Virginia for the summer. He then resided in Philadelphia, Pennsylvania until 2001 when he relocated to his current address in Norriton, Pennsylvania.

50.    In 2001, his wife purchased the residence located at 3110 Sycamore Lane, East Norriton, Pennsylvania. An initial home inspection was completed by the US Pretrial Services Office for Eastern District of Pennsylvania on May 28, 2021, and the defendant, his wife, and their son were present. The residence was described as a four-bedroom, two-bathroom single family home. A virtual home inspection was conducted on July 21, 2021. No issues were noted.

51.    Mr. Stenz indicated he does not have social media accounts.

**Physical Condition**

52.    The defendant is 5 feet, 11 inches tall and weighs 235 pounds.  He has brown hair and
       green eyes.  The defendant reported having no tattoos or birthmarks. He has scars on both
       arms and across his back from burns sustained in a house fire.

53.    Mr. Stenz advised he is in fair physical health. He advised that he suffers from hypertension
       (diagnosed 2017) and diverticulitis (diagnosed 2012). He is treated by Dr. Heidi Yutzler in
       Blue Bell, Pennsylvania and is prescribed Metoprolol 25mg daily. He indicated he is
       allergic to peanuts and Percocet. Although he suffered from asthma as a child, he noted
       that he outgrew the condition. He has not been diagnosed with COVID-19 and is fully
       vaccinated. He has a family history of sarcoma and diverticulitis. Medical records received
       from Dr. Yutzler showed the defendant is diagnosed with hypertension, pulmonary nodule,
       ADHD and depression; however, it was noted that Dr. Yutzler only prescribes medication
       for hypertension. He was last seen in her office on September 13, 2021. The defendant's
       mother verified his medical history and noted that he is "extremely" allergic to peanuts.

54.    The defendant advised that he has undergone two hernia repair surgeries. At age five or
       six, he underwent an inguinal hernia repair which was purportedly caused by an asthma
       attack, according to his mother. She noted that he was hospitalized at Delaware County
       Memorial Hospital for five days. In approximately 2005 or 2006, he underwent an
       umbilical hernia repair at Suburban Community Hospital in Norristown, Pennsylvania.
       Medical records were requested from the hospital but not received.

55.    In May 2017, Mr. Stenz advised that he was burned over seventy- percent of his body in a
       house fire which originated in the garage. He stated he was working on his motorcycle and
       when it backfired, it caught the garage on fire. The fire then spread to the house. The
       defendant indicated that his two children were in the house at the time, and in his efforts to
       ensure their safety, he suffered serious burns. He was treated at Crozier-Chester Medical
       Center in Upland, Pennsylvania and remained hospitalized in the burn center for
       approximately two months. While there, he indicated that doctors also found nodules on
       his lungs. Medical records were requested from the hospital but not received.

**Mental and Emotional Health**

56.    The defendant stated he was diagnosed with Attention Deficit Hyperactivity Disorder
       (ADHD) over 25 years ago by Dr. John Mesaros in Doylestown, Pennsylvania. He advised
       he was prescribed Adderall for the condition and took the medicine for approximately 20
       years before discontinuing the medication in 2017. Medical records were requested but not
       received.

57.    While on pretrial release in this case, Mr. Stenz advised he has been seeking counseling
       for anxiety and Post Traumatic Stress Disorder (PTSD) at Fairview Counseling in Reading,
       Pennsylvania. He advised that following the house fire, he experienced nightmares and
       panic attacks, and that after his arrest in the instant offense, he began experiencing anxiety.
       He initially attended counseling twice monthly and currently sees the counselor once

monthly. He is not prescribed medication. Medical records were requested but not received. Automated PSADC records indicated the defendant is compliant with mental health treatment.

58.    He noted that his brother was diagnosed with Asperger syndrome. He was not familiar with any other family history of mental illness.

### Substance Abuse

59.    Mr. Stenz advised he began smoking marijuana as a teenager and would use the substance once or twice per week over the ensuing years. He advised that he last used marijuana in June 2021 and had obtained a medical marijuana card. At age 12 or 13, he began consuming alcohol. Regarding the amount, he stated, "As much as I could find." He began regular use of alcohol at age 21 and described his drinking as "cyclical," noting he would drink for periods of time and then stop, with that pattern repeating over the years. He advised that he consumed a case of beer daily when drinking. The defendant advised he has not consumed alcohol since 2018. He has never participated in substance abuse treatment and does not believe he is in need of treatment services. As previously indicated, his NCIC record reflects an alcohol-related conviction in 1990.

60.    A urine sample was collected by the US Pretrial Services Office for the Eastern District of Pennsylvania on May 5, 2021 and was negative for illicit substances. On June 24, 2021, the defendant's urine sample was diluted, and the defendant admitted to vaping THC daily. He noted that he had a medical marijuana card but was advised by his supervising officer that he was not permitted to use any form of marijuana while on bail supervision.

### Educational, Vocational and Special Skills

61.    The defendant advised he completed the tenth grade at Plymouth-Whitemarsh High School in Plymouth Meeting, Pennsylvania in 1988. He withdrew from school following that year in order to begin working. In 1995, he reported attending the Community College of Philadelphia where he obtained his General Educational Development (GED) diploma. Verification received from the community college showed that he was enrolled in a GED preparation course in the fall of 1991. No other information was available. Records were requested from the high school but not received.

62.    In 2011, he completed a six-month training program at All-State Career School in Essington, Pennsylvania to obtain his Commercial Driver's License (CDL). Mr. Stenz advised that his most recent CDL was issued on August 3, 2019, and expires on March 13, 2023. Verification received from the school indicated he completed the training program on July 9, 2009.

### Employment Record

63.    At the time of his arrest the defendant was employed. He will remain in that status at the time of sentencing.

64.    Company records showed that since September 10, 2020, the defendant has been employed as a laborer for Delaware Valley Paving in Phoenixville, Pennsylvania. He is a full-time employee and noted that he works between 60 and 80 hours weekly. He earns $20 hourly plus overtime pay. He advised his employer is aware of the instant offense. Additionally, Mr. Stenz provided copies of his paystubs for verification purposes. The employer noted that the defendant is "always available for work and showed up on time."

65.    Company records showed that from August 7, 2015 to March 20, 2020, the defendant worked as a groundskeeper for Terra Lawn Care in Collegeville, Pennsylvania. He noted he was a full-time, seasonal employee and earned $16 hourly. He was laid off during the pandemic. Information provided by the employer indicated that he "quit when COVID shut the country down. He was offered a job to come back…but he refused." It was also noted that the defendant was "a somewhat consistent employee" but his work "was less than stellar." He was described as "polite and friendly."

66.    The only other period of employment reported by the defendant was with Kia of West Chester in West Chester, Pennsylvania for several months during an unrecalled time period. He indicated that he was a car salesman but could not recall his earnings. The employer was unable to locate employment records pertaining to the defendant.

67.    Mr. Stenz advised that from 1999 until approximately 2006 or 2007, he was a stay-at-home father to his children. He noted that he would occasionally work odd jobs; however, he was primarily supported by his wife. He indicated that upon re-entering the workforce, he briefly worked as a car salesman; however, when the economy declined, he began school to obtain his CDL.

68.    He did not recall other periods of employment.

69.    **Financial Condition: Ability to Pay**

**Assets**

| | | |
|---|---|---|
| Checking/Savings Account | Citizens Bank** | $1,500.00 |
| Vehicle | 2014 Chevrolet Camaro* | $12,611.00 |
| Vehicle | 2017 Jeep Grand Cherokee** | $33,977.00 |
| Vehicle | 2014 Volkswagen Jetta | $5,626.00 |
| Residence | 3110 Sycamore Lane** | $374,900.00 |
| **Total Assets** | | $428,614.00 |

**Liabilities**

| | | |
|---|---|---|
| Mortgage | PHH Mortgage** | $74,000.00 |
| Credit Cards** | | $1,750.00 |
| Student Loans** | | $25,000.00 |
| Auto Loan** | | $29,000.00 |

| | |
|---|---|
| **Total Liabilities** | $129,750.00 |
| **Total Net Worth** | $298,864.00 |

**Monthly Income**

| | |
|---|---|
| Salary | $9,264.00 |
| Spouse Income | $5,793.00 |
| **Total Monthly Income** | $15,057.00 |

**Monthly Expenses**

| | |
|---|---|
| Home/Mortgage | $1,430.00 |
| Utilities | $325.00 |
| Telephone | $120.00 |
| Cable | $110.00 |
| Groceries and Supplies | $1,000.00 |
| Auto Payment | $550.00 |
| Gas | $240.00 |
| Auto Insurance | $335.00 |
| Clothing | $200.00 |
| Credit Card Minimum Payments | $240.00 |
| Court Ordered Obligations | $101.00 |
| **Total Monthly Expenses** | $4,651.00 |
| **Total Monthly Cash Flow** | $10,406.00 |

**Analysis**

70.  The information contained on the Net Worth Statement and Monthly Cash Flow forms (dated November 16, 2021) was obtained from the defendant, who provided some documentation of his finances. Additional independent research was conducted through an automated credit report (Equifax, an unverified source of information), and a national comprehensive report (Accurint). Items marked with an asterisk (*) represent an asset or liability held jointly with his wife, Carla Stenz. Items marked with a double asterisk (**) represent an asset or liability held solely by his wife. The defendant is represented by retained counsel who is compensated by the defendant.

71.  Mr. Stenz advised he does not have checking or savings accounts in his name, and he does not own cryptocurrency. He indicated that his paychecks are deposited into his daughter, Brianna's, checking account. She obtained a credit card for the defendant and his wife which they use for personal expenses, such as attorney fees for this case. Brianna then pays the credit card balance with the funds deposited by the defendant. He did not report any liabilities in his name; however, his wife does have credit card debt as well as outstanding student loans, as noted in the table above.

72. The defendant is the owner of a 2014 Volkswagen Jetta which is driven by his son. The vehicle is lien free and has an internet fair market value (Kelley Blue Book) of $5,626 (good condition). He and his wife are the joint owners of a 2014 Chevrolet Camaro, which is lien free and has an internet fair market value of $12,611 (good condition). His wife is the owner of a 2017 Jeep Grand Cherokee, which has an estimated loan balance of $29,000. The monthly payment is $550. The vehicle has an internet fair market value of $33,977 (good condition); therefore, the equity is $4,977.

73. Lexis/Nexis records showed that on September 28, 2001, Carla Zameska purchased the property located at 3110 Sycamore Lane, East Norriton, Pennsylvania for $127,650. On August 27, 2014, the mortgage, in the amount of $126,648, was assigned to PHH Mortgage. The mortgage balance is approximately $74,000 and the monthly payment is $1,430. The home has a 2021 tax assessed value of $113,220 and an internet fair market value (Zillow.com) of $374,900. There is equity of $300,900.

74. A review of the defendant's December 20, 2021, credit report showed he has a medical collection account in the amount of $144 and two student loan collection accounts with a combined balance of $4,911. He has a credit card with a balance of $5,682 which has been charged off as a loss to the creditor. The report noted that the account was affected by a natural or declared disaster. There is also an auto loan with GM Financial in the amount of $12,032, which has a monthly payment of $396. Mrs. Stenz indicated that the auto loan was a joint loan for the 2014 Chevrolet Camaro; however, the loan has been paid in full and should have been removed from the defendant's credit report.

75. Accurint records showed that a civil judgment in the amount of $2,074 was filed against the defendant and his wife on December 11, 2007, in the Montgomery County Prothonotary in Pennsylvania. The creditor is Montgomery County. On March 27, 2013, a civil action was filed against the defendant and his wife in the same location. It does not appear a judgment was entered. The creditor was Sukhpett Singh.

76. The defendant provided copies of his federal income tax returns for the tax years 2017 through 2019. He indicated he has not filed a 2020 return. Each year, he filed jointly with his wife. Verification was not requested from the Internal Revenue Service.

77. In 2017, they had an adjusted gross income (AGI) of $83,677, which included wages of $80,633, unemployment compensation of $4,004, and student loan interest deduction of $960. They claimed a refund of $6,939.

78. In 2018, they had an AGI of $101,534, which included wages of $101,831 and student loan interest deduction of $297. They claimed a refund of $3,903.

79. In 2019, they had an AGI of $105,766, which included wages of $106,949, other income of $333, and adjustments of $1,516. They claimed a refund of $3,668.

80. Upon review of the defendant's financial information, it appears he has the ability to pay a fine in this case, in addition to the agreed upon restitution.

STENZ, Brian E.                                                                 Page 20

## PART D. SENTENCING OPTIONS

### Custody

81.  **Statutory Provisions:** The maximum term of imprisonment is six months for this Class
     B Misdemeanor. 40 USC § 5104(e)(2)(G).

82.  **Guideline Provisions:** Pursuant to USSG §1B1.9, the US Sentencing Guidelines do not
     apply to any count of conviction that is a Class B or C misdemeanor or an infraction.

### Impact of Plea Agreement

83.  Had Mr. Stenz pled guilty to Counts One and Two of the Information, he would have been
     exposed to a statutory maximum of one year imprisonment, a one-year term of supervised
     release, and a fine of $100,000 on these Class A misdemeanors. As to Count Three, he
     would have faced a statutory maximum of six months imprisonment and a fine of $5,000
     for this Class B Misdemeanor. As to Counts One and Two, he would have been subject to
     the US Sentencing Guidelines. Accordingly, the following guidelines calculation would
     have applied: a base offense level of 4, USSG §2B2.3(a), and a 2-level increase, pursuant
     to §2B2.3(b)(1)(A)(vii), resulting in a subtotal offense level of 6. Absent any objection
     from the Government for acceptance of responsibility, in consideration of USSG §3E1.1,
     the resulting total offense level would be 4. The defendant would have been assessed two
     criminal history points and his criminal history category would be II. The resulting
     guidelines range would be zero to six months of incarceration. At offense level 4, the
     applicable fine range is $500 to $9,500.

84.  In exchange for his guilty plea, the government agreed to request that the Court dismiss the
     remaining counts of the Information at the time of sentencing.

85.  The parties agreed that pursuant to USSG §1B1.9, the sentencing guidelines do not apply
     to Class B misdemeanors.

86.  The defendant acknowledged that the riot that occurred on January 6, 2021, caused, as of
     May 17, 2021, approximately $1,495,326.55 damage to the United States Capitol. The
     defendant agreed to pay restitution to the Architect of the Capitol in the amount of $500.

### Supervised Release

87.  **Statutory Provisions:** Count 4: Pursuant to 18 USC §§ 19 and 3583(b)(3), this offense of
     conviction meets the definition of a "petty offense," consequently, a term of supervised
     release is not applicable.

88.  **Guideline Provisions:** Pursuant to USSG §1B1.9, the US Sentencing Guidelines do not
     apply to any count of conviction that is a Class B or C misdemeanor or an infraction.

### Probation

89. **Statutory Provisions:** The defendant is eligible for up to five years probation because the offense is a misdemeanor. 18 USC § 3561(c)(2).

90. **Guideline Provisions:** Pursuant to USSG §1B1.9, the US Sentencing Guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an infraction.

91. In addition to the mandatory and discretionary conditions of supervision, 18 USC § 3563(a) and (b), the Court may impose other conditions as they relate to the nature and circumstances of the offense and the history and characteristics of the defendant. 18 USC § 3553(a)(1).

92. In consideration of the above, the Court may impose all or a combination of the following additional conditions: (a) payment of restitution; (b) payment of a fine; (c) financial disclosure; (d) substance abuse testing based on the defendant's history of alcohol and marijuana use; and (e) location monitoring with home detention in lieu of incarceration.

93. The Probation Officer researched available programs within the Bureau of Prisons (BOP) available to this defendant. However, the defendant's history does not support the need for transitional services.

### Mandatory Drug Testing

94. The Violent Crime Control and Law Enforcement Act of 1994 requires an individual under supervision, whose offense occurred after September 13, 1994, refrain from the unlawful use of a controlled substance; submit to one drug test within fifteen days of the commencement of supervision; and two additional periodic drug tests. The condition for mandatory drug testing may be ameliorated or suspended by the Court if reliable sentencing information indicates a low risk of future substance abuse by the defendant. 18 USC §§ 3563(a)(5) and 3583(d).

### Fines

95. **Statutory Provisions:** The maximum fine is $5,000. 18 USC § 3571(b).

96. A special assessment of $10 is mandatory. 18 USC § 3013.

97. **Guideline Provisions:** Pursuant to USSG §1B1.9, the US Sentencing Guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an infraction.

98. In determining the fine amount, the Court shall consider, among other factors, the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence. 18 USC § 3572(a)(6) and USSG §5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests that the Court use a monthly cost of $3,688.00 for imprisonment, a monthly cost of $2,980.00 for community confinement, and a monthly cost of $371.00 for supervision.

### Restitution

99.   **Statutory Provisions:** Pursuant to 18 USC § 3663(a)(3), restitution in the total amount of $500 shall be ordered in this case. Restitution, as set forth below, shall be paid to the Clerk of the Court for the United States District Court, District of Columbia, who shall forward the payments to:

| Victim Name | Amount of Loss |
|---|---|
| Architect of the Capitol<br>Office of the Chief Financial Officer<br>Attn.: Kathy Sherrill, CPA<br>Ford House Office Building, Room H2-205B<br>Washington, DC 20515 | $500.00 |

100.  **Guideline Provisions:** Pursuant to USSG §1B1.9, the US Sentencing Guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an infraction.

## PART E. FACTORS THAT MAY WARRANT DEPARTURE

101.  Pursuant to 18 USC § 3553(a), the Court shall impose a sentence sufficient, but not greater than necessary, to reflect the seriousness of the offense; to promote respect for the law and to provide just punishment for the offense; to afford adequate deterrence; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational/vocational training, medical care or other correctional treatment.


Respectfully Submitted,

**BRIAN D. SHAFFER**
**CHIEF UNITED STATES PROBATION OFFICER**

*Crystal S. Lustig*

By:   Crystal S. Lustig
Senior United States Probation Officer
(202) 565-1425


Approved:

2022.01.20 16:28:56
-05'00'

Renée  Moses-Gregory
Supervisory United States Probation Officer
(202) 565-1348

**STENZ**, Brian E.                                                    **Page 23**

## ADDENDUM TO THE PRESENTENCE REPORT
## UNITED STATES V. BRIAN E STENZ
## DOCKET NO.: 0090 1:21CR00456-001

### DISCLOSURE AND OBJECTION CHRONOLOGY

The presentence report was disclosed to counsel on December 27, 2021. The Government submitted the Receipt and Acknowledgment form on January 4, 2022, and the defendant and Defense Counsel did not submit the Receipt and Acknowledgment form.

### OBJECTIONS

By the Government

Counsel for the Government reviewed the report and material/factual inaccuracies were not noted.

By the Defendant

It is unknown if the defendant and Defense Counsel reviewed the report, as the Receipt & Acknowledgment form was not returned.

STENZ, Brian E.                                                                 Page 24

<u>Supplemental Information by the Probation Office</u>

Paragraphs 26, 27, 28, 29, and 30 were updated to include additional criminal history information received.

Paragraph 53 contains additional medical information.

Paragraphs 61 and 62 were updated regarding educational information.

Paragraphs 64, 65, and 66 contain additional employment education.

Paragraph 92 was updated regarding special conditions of probation.

Respectfully Submitted,

**BRIAN D. SHAFFER**
**CHIEF UNITED STATES PROBATION OFFICER**

*Crystal S. Lustig*

By:    Crystal S. Lustig
        Senior United States Probation Officer
        (202) 565-1425

APPROVED BY:

                    2022.01.20 16:29:12
                    -05'00'

Renée  Moses-Gregory              Date
Supervisory United States Probation Officer
(202) 565-1348