**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-CR-00456 (BAH)** |
| **v.** | : | |
| | : | |
| **BRIAN E. STENZ,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Brian E. Stenz ("Stenz") to 14 days' incarceration followed by a period of 36 months' probation, and sixty hours of community service, and to order $500 in restitution.

**I.       Introduction**

The defendant, Brian E. Stenz, an employee at a paving company and a resident of East Norriton, Pennsylvania participated with a friend in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

Stenz pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol building. As explained herein, a sentence of 14 days' incarceration followed by a period of 36 months' probation is appropriate in this case. Stenz admitted to the FBI that he observed violence and destruction outside of the Capitol building but

1

chose to enter anyway.  Specifically, Stenz stated that he saw people breaking windows in order to gain entry to the Capitol, observed rioters hanging from the scaffolding outside the Capitol, and saw what he believed to be blood in a fountain, but chose to enter the Capitol Building anyway. Stenz entered the Capitol Building through the Senate Wing door, where he observed broken glass from two windows strewn across the floor and a broken and overturned wooden cabinet.  Stenz admitted during his interview with the FBI that he sat on a police motorcycle parked outside of the Capitol and had someone take a photograph of him doing so.  Stenz then went so far as to enter Senate Office S140, the office of Senator Jeff Merkley, which was ransacked and where Stenz took photographs.  Stenz continued on to the Crypt, where he took more photographs.  Following his participation in the riot on January 6, Stenz texted several acquaintances a series of eight photographs documenting his activities on January 6, including a selfie of Stenz and his friend in the Crypt, and a photograph of a bookcase and chair inside Senator Merkley's office.  Stenz also failed to tell law enforcement when he was interviewed that he entered into a Senator's office, and instead said that he went into a place that appeared to be a gift shop.  Stenz admitted to destroying the aforementioned text messages and photographs from his phone (though he did later obtain the photographs from his daughter and provide them to the FBI).  Stenz has a significant criminal history and knowingly engaged in this conduct during a time when he had criminal charges pending against him in Pennsylvania for falsifying records related to the purchase of a firearm. Yet, he chose to enter the Capitol anyway.

The Court must also consider that Stenz's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings.  But for his actions alongside so many others, the riot likely would have failed.  Here, Stenz's participation in a riot

that actually succeeded in halting the Congressional certification combined with the defendant's observation of violence and destruction, his entry into a senator's office, his criminal history, and the fact that he had a pending criminal case at the time he engaged in this conduct, renders a sentence 14 days' imprisonment followed by 36 months' probation – both necessary and appropriate.

The government also notes an inaccuracy in the defendant's sentencing memorandum. *See* ECF 31. The defendant repeatedly states that the "government" recommended a sentence of probation for Stenz, then cites to the "Government's" Presentence Investigation Report and Recommendation. *Id* at 2, 3, and 5. As this Court knows, this government's sentencing recommendation can and sometimes does differ from that of Probation, as is the case here. In this case, the government recommends a sentence of 14 day's imprisonment followed by 36 months' probation.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 27 (Statement of Offense), at ¶ 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Stenz's conduct and behavior on January 6.

### Brian Stenz's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Brian Stenz and his friend traveled to Washington, D.C., from their homes in Pennsylvania to attend the "Stop the Steal" rally. Stenz and his friend then followed a crowd to the Capitol Building. Stenz described to the FBI in an interview with his attorney present

that he saw what he believed to be blood in a fountain, observed rioters hanging from the scaffolding outside the Capitol, and saw people breaking windows in order to gain entry to the building. Stenz nonetheless moved closer to the front of the crowd and chose to enter the Capitol building anyway.

At 3:07 p.m., Stenz and his friend entered the Capitol Building through the Senate Wing door. This entrance was breached approximately one hour earlier and the glass from two broken windows was scattered across the floor. Stenz stood outside of Capitol in the area of the Senate Wing door either before or after entering the building. *See* Exhibit 1. In this open-source video, Stenz can be seen standing outside the area of the Senate Wing doors, in front of a broken window. An alarm can be heard sounding in the background. Stenz would have seen the broken windows and glass, as well as a broken wooden cabinet overturned on the floor, upon his entry into the Capitol. *See* Exhibit 2, CCTV. Figure 1 below is a still shot from Exhibit 2. Stenz is circled in red, and the overturned cabinet and broken glass are circled in green.



Figure 1

As Stenz walked by this destruction, he smiled and talked with this friend, then appeared to take a puff of a vaping device[1] as shown in Figure 2 below.



Figure 2

Stenz can be seen in Exhibit 2 motioning to his friend to continue walking in the direction to the left of the camera.  After entering, Stenz walked down this hallway further into the Capitol Building.  Immediately to his left after leaving the Senate Wing door lobby, Stenz entered Senate office S140, which is the office of Senator Jeff Merkley.  It is unknown how long Stenz remained in Senator Merkley's office, but deducing from CCTV, it was at most four minutes. Nonetheless, any amount of time spent in such a sensitive area of the building is significant.  The photograph displayed below as Figure 3 is one that Stenz texted to an acquaintance following his participation in the riot.  The photograph shows what is known to be a chair and bookcase from the senator's office.

---

[1] Defendant told probation that he vapes THC daily and has a medical marijuana card.  *See* ECF 29, ¶ 60.



Figure 3

Stenz was not the only rioter in Senator Merkley's office.[2]   Later that night, Senator

Merkley returned to his office – the office Stenz had entered and occupied earlier – and found that

it had been ransacked.  The senator recorded the damage he found and shared it via a video on

social media.[3]  *See* Exhibit 3.  The chair and bookcase in Figure 3 above are visible in this video.

---

[2]      The Government's Sentencing Memorandum in *United States v. Felipe Marquez*, 21-cr-
136 (RC), ECF No. 28 at 8, describes how Marquez entered Senator Merkley's office at around
3:00 p.m., shortly before Stenz did, filmed other rioters smoking in the room, and himself smoked
from a vape pen.  Defendant Brandon Fellows also described how "I walked in there's just a bunch
of people lighting up in some Oregon room…they were smoking a bunch of weed in there."
Affidavit in Support of Criminal Complaint and Arrest Warrant, *United States v. Brandon Fellows,*
No. 21-cr-83 (TNM), ECF No. 1 at ¶ 15.
[3]  The video can also be viewed here:  https://www.facebook.com/ABCNews/videos/sen-jeff-
merkley-shows-damage-done-to-office-after-pro-trump-mob-vandalized-
capi/222464836136603/.

In the video, Senator Merkley explained that rioters appeared to have "smashed the door virtually off its hinges," even though the door was unlocked.  He pointed out how the floor was littered with debris.  He showed a scroll made for him by a Chinese calligrapher that rioters had torn from the wall.  He said that the rioters "left a Trump flag here to mark their presence."  Senator Merkley narrated how the rioters "stole the laptop that was sitting on the table," and panned across his conference table to show the damage and disarray.  He then zoomed in on ashes and a cigarette butt on a desk to note that the rioters appeared to have been "smoking something" in the office, before focusing on another discarded cigarette butt or joint on the floor.  In Senator Merkley's words, one could "count this office trashed." *Id*.

During his interview with the FBI, Stenz admitted to touching a book about the history of shoes, which one could infer occurred during the time Stenz was in Senator Merkley's office.  Although there is no evidence that Stenz contributed to the property damage in the senator's office, his entry into the Capitol building and office S140 demonstrate a shared purpose with the other rioters.

Stenz also entered the Crypt of the Capitol Building, and during his time there, he proudly took a selfie documenting himself (in the forefront) and his friend, seen below as Figure 4.



Figure 4

At approximately 3:15 p.m., after a total of eight minutes inside the Capitol building, Stenz decided to leave.  During his time at the Capitol, Stenz documented the destruction he saw with his phone, including the below photographs included as Figures 5 and 6, which depict the broken windows of the Senate Wing door.



Figure 5



Figure 6

Following his actions on January 6, Stenz texted photographs, including those in Figures 3 through 6 above, to several of his acquaintances. Additionally, during the time when Stenz chose to enter the Capitol building, he had a pending criminal case in Montgomery County, Pennsylvania, for falsifying records related to the purchase of firearms. He is currently on probation for that offense. *See* ECF 29, ¶ 30.

The government acknowledges that a mitigating factor in this case is that on January 18, 2021, Stenz – through his attorney – contacted the United States Attorney's Office in D.C. regarding Stenz's January 6th crimes. It is not clear whether Stenz was aware at that point that only two days prior, a tipster who was an acquaintance of Stenz's was interviewed by law enforcement. Nonetheless, Stenz voluntarily submitted to an interview with the FBI on April 9, 2021, during which he expressed remorse for his actions.

*Brian Stenz's Interview*

Stenz voluntarily agreed to an interview with the FBI prior to his arrest.  During the interview, Stenz admitted that he was at the Capitol on January 6, 2021.  He stated that he was a supporter of former President Trump and felt that the election had been stolen from him.  He explained that he traveled to Washington, D.C. with "a kid from the neighborhood" to attend Trump's rally, driving with this friend from Pennsylvania to a train station outside of Baltimore, MD, and then taking the train into Washington, D.C.  Stenz claimed to know his friend's first name only.  Stenz stated that after Trump's speech, he and his friend followed the crowd to the Capitol building.  Stenz admitted that those in the crowd appeared to be angry and were yelling about former Vice President Pence.  He also stated that he observed blood on a fountain, people hanging from scaffolding, and breaking windows, yet he chose to enter the Capitol building anyway.  Stenz stated that once inside, he saw people "trashing the place" and saw men urinating on the floor.  He admitted to going into a large room containing statues, likely referring to the Crypt.  According to Stenz, he was upset by the destruction and disrespect he witnessed, so he left the building and he and his friend left Washington, D.C. that day.  Stenz admitted to texting some of the photographs he took that day to a group chat of acquaintances from his previous job.  Stenz stated that he had deleted the photographs and text messages, and that he was ashamed of being part of January 6.

Stenz was for the most part truthful during the interview.  However, Stenz stated that he was inside the Capitol for about 3 minutes, when in fact he remained inside for 8 minutes.  Additionally, Stenz did not disclose that he had entered a senator's office or any office for that matter.  Instead, he stated that he went into what appeared to be a bookstore or giftshop.

*The Charges and Plea Agreement*

11

On February 28, 2021, Brian Stenz was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On February 30, 2021, Stenz voluntarily surrendered.   On July 8, 2021, Brian Stenz was charged by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).   On November 12, 2021, he pleaded guilty pursuant to a plea agreement to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  In his plea agreement, Stenz agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Stenz now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, Stenz faces up to six months of imprisonment and a fine of up to $5,000.  Stenz must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as

described below, many of the Section 3553(a) factors weigh in favor of a sentence of 14 day's incarceration followed by 36 months' probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Additionally, while looking at Stenz's individual conduct, we must assess such conduct on a spectrum.  This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated   sincere remorse or

contrition.  While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Stenz personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct.  The absence of violent or destructive acts on the part of Stenz is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Stenz from most other misdemeanor defendants.  Stenz's lack of violence and property destruction explains why he was charged with, and permitted to plead to, only a misdemeanor rather than a felony.

Stenz travelled almost 150 miles to participate in the riot at the Capitol on January 6.  Once there, despite the violence and destruction he witnessed, he entered the Capitol Building through the Senate Wing door.  Stenz's conduct inside the building is more troubling than those who simply marched through the Crypt or the Rotunda; Stenz actually made his way into the personal office of Senator Merkley.  Stenz took multiple photographs documenting his time at the Capitol – some that showed the destruction that took place there – and texted those photographs to a group of acquaintances.  Stenz has a criminal history and had a criminal case pending in Pennsylvania at the time he chose to enter the Capitol.  Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration.

### B.  The History and Characteristics of the Defendant

Stenz is a 51-year-old man from Pennsylvania, who is currently employed at a paving company.  Stenz appears to have strong familial support – he is married with three adult children, one of whom resides with Stenz and his wife.  Stenz admitted to alcohol abuse but has been sober since 2018.  Stenz has been compliant with the conditions of pre-trial release.

14

As set forth in the PSR, Stenz has a criminal history that dates back to age 19, with five prior convictions.   ECF 29 ¶¶ 26-31.   This history consists of guilty pleas to misdemeanor violations of driving under the influence, obstruction of emergency services, unsworn falsification to authorities (in connection with his attempted purchase of a gun), possession of marijuana, and harassment.  *Id.* at ¶¶ 26-28.   Significantly, in 2007, Stenz was sentenced to 3 years' probation when he pled guilty to stalking and harassing his neighbors, including calling them obscenities and threatening to burn their house down.  *Id.* at ¶ 28.   In 2018, Stenz pled guilty to obstruction of emergency services (a misdemeanor).  *Id.* at ¶ 29.   In that case, Stenz recklessly started a fire in his garage by revving his motorcycle; the fire unfortunately spread to his home.  Stenz did not alert emergency services to the fire, and when they arrived, he refused orders from them to exit the house and was combative with medics attempting to help him.  *Id.*   On January 21, 2021, Stenz pled guilty to unsworn falsification to authorities (a misdemeanor) and received a sentence of one year's probation.[4] *Id.* at ¶30.   In that case, Stenz, when attempting to purchase a firearm in Pennsylvania, lied on his application by falsely asserting that he had never been convicted of a crime for which he could have received a sentence of imprisonment of more than one year.  *Id.*  It was that case that was pending when Stenz chose to enter the Capitol.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the

---

[4] Because Stenz was sentenced on January 21,2021 to one year of probation, it appears that Stenz is not currently on probation.

democratic process."[5]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of home detention.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

[5] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry.  Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society.  Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence.  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Brian Stenz's criminal history demonstrates the need for specific deterrence.  As recently as January 2018, Stenz was arrested related to his attempt to illegally purchase a firearm, and in connection with that arrest, Stenz pled guilty to unsworn falsification to authorities on January 21, 2021.   That case was pending when Stenz made the choice to illegally enter the Capitol. Unfortunately, it does not appear that Stenz's prior contacts with the criminal justice system – all of which have resulted in sentences of probation (not imprisonment) – have caused him to choose

to lead a law-abiding life.  A strong message of deterrence – through a sentence that includes a brief period of incarceration – is necessary to discourage Stenz from continuing to break the law.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[6]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.  Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

Stenz has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating, or picketing in the Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G).  This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and

---

[6]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.   And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.   *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity.  *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants

were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who spent time in sensitive places within the Capitol.  A defendant's entry into a sensitive space, such as the Senate Floor or a member's office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda.  A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people.  That person's presence is even more disruptive.  An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

One of the most famous photographs from January 6 is that of a rioter in Speaker Pelosi's office, with his feet on her desk.  *See* Amended Complaint, *United States v. Richard Barnett,* 21-cr-38, ECF No. 3, at 2.  That photograph has become notorious likely for exactly this reason, because of what invading the office of a member of Congress represents: a show of intimidation, an attempted display of power, above and beyond entering the building.  As noted above, while Senator Merkley's office was not labeled as such, it was clearly recognizable as a private office, and thus implicates similar concerns.

In *United States v. Derek Jancart and Erik Rau*, 21-cr-148 (JEB) and 21-cr-467 (JEB), the defendants pled guilty to misdemeanor charges of 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building) in connection with penetrating the Capitol building all the way to the Speaker's Conference Room.  Judge Boasberg sentenced the defendants each to 45 days'

incarceration.  A misdemeanant who reached the Senate Floor, even though she does not appear to have known where she was, also received a sentence of incarceration. *United States v. Courtright,* No. 21-cr-72 (CRC) (30 days incarceration).

Like Jancart and Rau, defendant Andrew Ericson went to the Speaker's Conference Room where he posed for a selfie, as well as for a photograph resting his feet on the conference table, took a beer from a mini-fridge, and posted his involvement to social media. Gov. Sentencing Mem., *United States v. Andrew Ericson,* 21-cr-506 (TNM), ECF No. 37 at 3.  The government recommended 60 days' jail time, and Judge McFadden imposed a sentence of 20 days' imprisonment, discussing the defendant's entry into an office as follows: "That's a private area and your violation of that space suggests a certain brazenness and intentionality that requires consideration in your sentence.  You could have caused a very dangerous and fearful scene had the speaker or her staff been present in the office when you and others entered it." *Ericson,* Tr. 12/10/21 at 21. Judge McFadden concluded that entering offices put Ericson in a "different category" than people "who were only in areas that would normally be open for tours." *Id.* Stenz, unlike Ericson, does not appear to have engaged in destruction while in Senator Merkley's office, though he did admit to touching a book.  However, Stenz has a significant criminal history, whereas Ericson had only been arrested once prior for possession of marijuana and ordered to pay a fine.  Gov. Sentencing Mem., *Ericson,* at 11.  Here, Stenz's conduct in a sensitive area is less severe than Ericson's but his criminal record is worse. This suggests that a sentence of incarceration for Stenz that is comparable to the 20 days Ericson received would avoid unwarranted sentencing disparities.

In *United States v. Matthew Mazzocco*, 21-cr-54 (TSC), the defendant pled guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating or picketing in a

Capitol Building) in connection with spending time inside the Spouse's Lounge of the Capitol. Judge Chutkan sentenced the defendant to 45 days of incarceration. While inside the Spouse's Lounge, Mazzocco warned others not to take or destroy anything and said that they were probably going to get in trouble for what they were doing.  Gov. Sentencing Mem., *Mazzocco*, 21-cr-54, ECF No. 28 at 6.  Mazzocco took photographs of himself smirking during the riot and posted them to social media. By contrast, Stenz took at least one photograph of himself and his friend but did not post photographs to social media.  *Id.* at 2, 12.  Mazzocco was also aware of the crowd outside the Capitol and entered through the Senate Wing door just two minutes after Stenz did.  *Id.* at 3, 7-8, 13.  Unlike Stenz, Mazzocco did not have a criminal history.  *Id*. at 2.

Another defendant who entered an office space, Charles Pham, also received a sentence of 45 days' imprisonment. *United States v. Charles Pham,* No. 21-cr-109 (TJK).  Pham was an active-duty police officer who downplayed his conduct to the FBI, saw confrontations between rioters and police before entering the building, yelled "we're taking the house back!," and was inside the building for approximately 20 minutes. Gov. Sentencing Mem., *Pham*, ECF No. 36, at 2.

The government acknowledges that defendant Felipe Marquez, who also entered Senator Merkley's office, received a sentence of three months' home detention; the government had recommended four months' incarceration. *United States v. Marquez,* 21-cr-136 (RC).  Judge Contreras, however, explained that Marquez's documented mental-health issues had a "significant influence" on his sentence, and believed that probation would best allow Marquez to receive mental-health treatment.  *Marquez,* Tr. 12/10/21 at 32, 34, 37.  Conversely, Stenz appears to have a relatively less severe history of mental-health issues, which played no role in the crime at hand. Additionally, where Marquez had no criminal history, the same cannot be said for Stenz.

One other defendant, Gary Edwards, who also entered Senator Merkley's office, received a probationary sentence. Edwards was a 68-year-old retiree with no criminal record who was in the senator's office for less than one minute, and there was no evidence that he engaged in any flagrant conduct while there. *See United States v. Edwards,* 21-cr-366 (JEB). Unlike Edwards, Stenz knew of the violent nature of the Capital breach at the time he entered, has a criminal history, and had pending criminal charges at the time.

Notably, Stenz – through his attorney – contacted law enforcement officials on January 18, 2021. On that basis, this Court could consider the cases of January 6 defendants David Mish and Eliel Rose for comparison. Mish was sentenced to 30 days' incarceration despite the fact that he came forward to the MPD to report what he had witnessed when Ashli Babbitt was shot. *See United States v. Mish,* 21-cr-112 (CJN). Mish also had a criminal history more severe than Stenz's – one that included 19 prior convictions. Like Stenz, Mish observed a broken window before he entered the Capitol. Mish, however, also observed violence inside the building.

Defendant Eliel Rosa, on the other hand, was sentenced to 12 months' probation. *See United States v. Rosa,* 21-cr-68 (TNM). Stenz is distinguishable from Rosa, however, because Rosa reached out to the FBI just days after the riot and had no criminal history. Additionally, Rosa did not enter any sensitive spaces.

The government has often asked for and received a period of incarceration where the defendant displayed a significant criminal history. Aside from *Mish*, discussed above, in *United States v. Robert L. Bauer* (21-cr-49 (TSC)), Bauer was in the Capitol for approximately 17 minutes, observed violence inside, admonished other rioters not to assault law enforcement, posed for selfies, and turned himself in early. Bauer had a criminal history that involved four previous drug-related convictions, and a three-year prison sentence. Gov. Sentencing Mem., *Bauer*, 21-cr-49,

ECF No. 33 at 11-12.  In *Bauer*, the government requested 30 days' incarceration, and Bauer received 45 days' incarceration.  Similarly, defendant Mark Simon was sentenced to 35 day's incarceration where he had a very significant criminal history that included at least 7 prior convictions, one of which was a crime of violence, had violated probation in the past, and was on supervision at the time of January 6th.  Gov. Sentencing Mem., *Simon*, 21-cr-67, ECF No. 32 at 10, 12-13.  Unlike Stenz, Simon observed violence inside the Capitol building, and posted on social media.  *Id*. at 9.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     The Court's Lawful Authority to Impose a Split Sentence

The sentence requested by the government—14 days' incarceration followed by 36 months of probation—is a lawful one.  A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense, such as the

crime at issue in this case. *See* 18 U.S.C. § 3561(a)(3). In addition, for a defendant convicted of any federal offense, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### a. *A sentence imposed for a petty offense may include both incarceration and probation.*

#### i. Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[7] followed by a term of probation, such as the sentence requested by the United States here.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as

---

[7] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part V(b) *infra*.

authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18

U.S.C. § 3551(b).[8]  As a general matter, therefore, "a judge must sentence a federal offender to

either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d

337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of

probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced

to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant

is an individual; (2) the offense is an offense for which probation has been expressly precluded; or

(3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different

offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D.

Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight'

imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress

considered adding the following sentence to the end of Section 3561(a)(3): "However, this

paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense

if the defendant has been sentenced to a term of imprisonment at the same time for another such

offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section

3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing

language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form,

therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation

---

[8] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition
to any other sentence." 18 U.S.C. § 3551(b).

unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

ii. Analysis

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation). In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b). *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal*

28

*Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for three reasons.  First, Section 3551(a) notes that the sentencing provisions described there apply "[e]xcept as otherwise specifically provided." Section 3561(a)(3) does "provide[]" "otherwise": it recognizes a carveout for petty offenses.

Second, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b).  *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one.").  When Congress enacted the general

29

prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3).  *See supra*, at 3 (recounting statutory history). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases.  Scalia & Garner, *supra*, at 184.   In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Ibid.*

Third, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls.  *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329.   Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail."  *Id.* at 185.   "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers."  *Ibid.*  Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147-CKK, Doc. 70 at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning.  When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous

incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991, *see supra*, at 3, does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Here, Stenz pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

**b.   *A sentence of probation may include incarceration as a condition of probation,
though logistical and practical reasons may militate against such a sentence
during an ongoing pandemic.***

i.   Relevant Background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563.

Among the discretionary conditions of probation a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other
> intervals of time, totaling no more than the lesser of one year or the term of
> imprisonment authorized for the offense, during the first year of the term of
> probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility"

to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983

WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement"

such as "for a week or two." *Id.*[9]

ii.   Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or, as

here, up to the six-month statutory maximum) as a condition of probation, so long as the

imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C.

§ 3653(b)(10).  Although the statute does not define an "interval of time," limited case law suggests

that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States

v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section

---

[9] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation
was "not intended to carry forward the split sentence provided in Section 3561, by which the judge
imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL
25404, at *98.

3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[10]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539.  Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.  Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.  In this case, the government does not request that imprisonment be imposed through "intermittent" confinement as a condition of probation.

## VI.    Conclusion

---

[10] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison.  Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular."  1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence.  Balancing these factors, the government recommends that this Court sentence Brian Stenz to 14 day's incarceration followed by 36 months' probation, and sixty hours of community service.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Stenz's liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      /s/ *Grace Albinson*
GRACE ALBINSON
NY Bar No. 4952697
Trial Attorney, U.S. Department of Justice
Capitol Riot Detailee
150 M Street, N.E.
Washington, D.C. 20002
(202) 598-3276
Grace.E.Albinson@usdoj.gov

34

## **CERTIFICATE OF SERVICE**

On February 3, 2022, a copy of the foregoing was served on counsel of record for

the defendant via the Court's Electronic Filing System.

/s/ *Grace Albinson*
GRACE ALBINSON
Trial Attorney
Capitol Riot Detailee