UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

* * * * * * * * * * * * * * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Criminal Action |
| | ) No. 21-456 |
| vs. | ) |
| | ) |
| BRIAN E. STENZ, | ) February 17, 2022 |
| | ) 9:28 a.m. |
| Defendant. | ) Washington, D.C. |

* * * * * * * * * * * * * * *

**TRANSCRIPT OF SENTENCING HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

**APPEARANCES:**

FOR THE UNITED STATES:
                        GRACE ALBINSON
                        U.S. Department of Justice
                        150 M Street, N.E.
                        Washington, DC 20002
                        (202) 616-3311
                        Email: grace.e.albinson@usdoj.gov

                        JAMES PEARCE
                        U.S. Department of Justice
                        Criminal Division Appellate Section
                        950 Pennsylvania Ave N.W.
                        Washington, DC 20530
                        (202) 532-4991
                        Email: james.pearce@usdoj.gov

FOR THE DEFENDANT:    JOSEPH MARRONE
                        200 S. Broad Street
                        Philadelphia, PA 19102
                        (215) 732-6700
                        Email: Jmarrone@marronelaw.com

ALSO PRESENT:         CRYSTAL LUSTIG, Probation Officer

                        CHRISTINE SCHUCK, Pretrial Agent,
                        Appearing via Zoom and/or telephonically

Court Reporter:       Elizabeth Saint-Loth, RPR, FCRR
                        Official Court Reporter

Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

**P R O C E E D I N G S**

1          **P R O C E E D I N G S**

2                    THE COURTROOM DEPUTY:  Matter before the Court,

3          Criminal Case No. 21-456.  United States of America versus

4          Brian E. Stenz.

5                    Your Honor, for the record, Probation Officer

6          Crystal Lustig and Pretrial Agent Christine Schuck are

7          appearing via Zoom.

8                    THE COURT:  Thank you.

9                    THE COURTROOM DEPUTY:  Counsel, please come

10         forward and state your names for the record, starting with

11         the government.

12                   MS. ALBINSON:  Good morning, Your Honor.

13         Grace Albinson for the United States.  And here with me is

14         James Pearce; he is working on the appellate cases.

15                   THE COURT:  Yes.

16                   MS. ALBINSON:  Do you know him?

17                   THE COURT:  Yes.  Good morning, Mr. Pearce and

18         Ms. Albinson.

19                   MR. MARRONE:  Good morning, Judge.

20         Joseph Marrone, on behalf of the defendant, Mr. Brian Stenz.

21                   THE COURT:  All right.  Good morning, Mr. Marrone.

22                   Good morning, Mr. Stenz.

23                   THE DEFENDANT:  Good morning, Your Honor.

24                   THE COURT:  All right.  We're here this morning

25         for the sentencing of the defendant, Brian Stenz, who

1    pleaded guilty to the petty offense in Count 4 of the

2    information against him, for parading, picketing, and

3    demonstrating in the Capitol Building.

4           For the record, this sentencing hearing is being

5    held in person but the public access line is being made

6    available for persons to listen to these proceedings

7    remotely.  We still have the pandemic ongoing, and this is a

8    high transmission area; so the public access line will

9    enable people to listen without having to physically be here

10   in the courthouse, and it helps to keep the numbers of

11   people down here.

12          I do want to remind anybody listening on the

13   public access line to this sentencing hearing that, under my

14   standing order 20-20, recording and rebroadcasting of court

15   proceedings, including those held by videoconference, is

16   strictly prohibited.  Violation of these prohibitions may

17   result in sanctions, including removal of court-issued media

18   credentials, restricted or denial of entry to future

19   hearings, or other sanctions deemed necessary by the

20   presiding judge.

21          All right.  I am going to begin this sentencing

22   hearing as I do all such hearings, by reviewing all of the

23   materials that I have reviewed in connection with the

24   hearing, to make sure that all sides -- both parties -- are

25   working from the same set of documents that I am.

1              So I have received, in advance of the hearing, the

2    sentencing memoranda submitted by the government, docketed

3    at ECF 32 and on behalf of the defendant docketed at ECF 31.

4              I have also received the three videos listed in

5    the government's report and position regarding public

6    release of video evidence re Brian E. Stenz's sentencing

7    that was docketed at ECF 33.  And I have reviewed all of

8    those videos, and they have been made publicly accessible.

9              I have also reviewed a total of about ten letters

10   submitted by Mr. Stenz's family, one letter from his current

11   employer, and letters from friends.

12             Does the government have all of those documents?

13             MS. ALBINSON:  Yes, Your Honor.

14             THE COURT:  I know the plexiglass is set up, so --

15             MS. ALBINSON:  It's hard to see.

16             THE COURT:  You know, I think what government

17   counsel has been doing -- because of the setup of the

18   plexiglass in my courtroom -- is they have been sitting on

19   the other side of the table which --

20             MS. ALBINSON:  Okay.  We can do that.

21             THE COURT:  It has a mic.  Yes.  And we put a mic

22   on that side of the table because it makes it a little bit

23   easier for you and for me, so feel free to move.

24             MS. ALBINSON:  Happy to.

25             THE COURT:  All right.  Isn't that better?

```
 1                 MS. ALBINSON:  Yes.

 2                 THE COURT:  Excellent.  Okay.

 3                 I know we're all -- even after two years we're

 4      still getting used to the configurations of the courtrooms

 5      with the plexiglass, and working around it.

 6                 MS. ALBINSON:  Yes.

 7                 THE COURT:  All right.  So Mr. Stenz -- and does

 8      defense counsel have all of the documents that I have just

 9      listed?

10                 MR. MARRONE:  Yes, Your Honor.

11                 THE COURT:  Okay.  So, Mr. Stenz, why don't you

12      stand while I address you.

13                 THE DEFENDANT:  Yes, Your Honor.

14                 THE COURT:  This proceeding will proceed in three

15      different steps.  And I like to tell defendants who are

16      appearing in front of me -- and their families who may be

17      listening or present in the courtroom -- what's going to

18      happen next during the hearing, mostly so that you know at

19      what point in the hearing you will have the opportunity to

20      address me directly if you wish.

21                 THE DEFENDANT:  Yes, ma'am.

22                 THE COURT:  So there are three steps to this

23      hearing.  The first step is to determine whether the

24      government or you have any objections to the factual or

25      other portions of the presentence investigation report
```

1    prepared by the probation office in your case; and if there

2    are any objections, I will resolve those.

3              The second step of the hearing is to hear from the

4    government first, then from your lawyer.  And, then, lastly

5    from you, if you wish to be heard, about sentencing in this

6    case; and specifically addressing factors that I, as a

7    sentencing judge, am required to consider under 18 U.S.C.

8    Section 3553(a).

9              The last step requires me to explain the reasons

10   for the sentence I am about to impose and then to impose

11   sentence on you.

12             Do you have any questions about what is going to

13   be happening during this hearing?

14             THE DEFENDANT:  No, Your Honor.

15             THE COURT:  All right.  You may be seated.

16             THE DEFENDANT:  Thank you.

17             THE COURT:  All right.  So step one, presentence

18   investigation report, the final presentence report and the

19   sentencing recommendation, docketed at ECFs 29 and 30, were

20   filed on January 20th.

21             And I understand from the PSR that the government

22   has no objection to any portions of the presentence

23   investigation report; is that correct?

24             MS. ALBINSON:  That's correct, Your Honor.

25             THE COURT:  All right.  Mr. Marrone, have you and

 1     your client read and discussed the presentence investigation

 2     report?

 3               MR. MARRONE:  Yes, we have, Your Honor.

 4               THE COURT:  And, Counsel, I know the mic is down,

 5     but you can lift it.  So when you are speaking to me, if you

 6     could just rise.

 7               MR. MARRONE:  Sure.  Yes, we have read it.

 8               THE COURT:  And just rise.

 9               MR. MARRONE:  I'm sorry.

10               THE COURT:  And you have to turn your mic on.

11               MR. MARRONE:  There we go.

12               THE COURT:  All right.  Okay.

13               And I understand, from the last page of the

14     presentence investigation report, that you didn't return the

15     response to the probation office indicating whether or not

16     you had any objections to any parts of the PSR.  So

17     illuminate me.

18               Does the defendant have any objections to any of

19     the factual statements or other determinations set forth in

20     the PSR?

21               MR. MARRONE:  He does not, Judge.

22               And he signed the form today.  I apologize.

23               THE COURT:  Okay.  Thank you.

24               You may be seated, Mr. Marrone.

25               Mr. Stenz, please remain standing.

1              THE DEFENDANT:  Yes, Your Honor.

2              THE COURT:  Are you fully satisfied with your

3     lawyer in this case?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  And do you feel that you have had

6     enough time to talk to Mr. Marrone in preparation for this

7     sentencing hearing about the probation department's

8     presentence investigation report and its sentencing

9     recommendation in your case?

10             THE DEFENDANT:  Yes, Your Honor.

11             THE COURT:  All right.  You may be seated.

12             THE DEFENDANT:  Thank you, Your Honor.

13             THE COURT:  Hearing no objection by either side,

14    the Court will accept the factual portions of the

15    presentence investigation report as undisputed and as my

16    findings of fact at sentencing as supplemented with my own

17    review of the video exhibits in this case.

18             All right.  So we're now at the second step of the

19    hearing where I will hear the parties.  So I will turn first

20    to the government; and you can step forward to the podium in

21    front of me.

22             And based on the papers that have been submitted,

23    the government has recommended 14 days of imprisonment to be

24    followed by a period of 36 months' probation; and that is

25    compared to the recommendation from the probation office and

1      the defendant for a period of probation of no more than 24

2      months with no period of incarceration.

3            So I will hear you on why it is that you believe a

4      period of incarceration is warranted in this case.

5            MS. ALBINSON:  Yes, Your Honor.  Thank you.

6            The government understands that a split sentence

7      requesting 14 days imprisonment is a significant sentence

8      for a misdemeanor case; but this was not a normal crime and

9      it doesn't merit a normal sentence.

10            The crime that Mr. Stenz committed, along with the

11      crimes of thousands of other rioters on January 6th, were

12      unique and significant to our country's history.

13            January 6 was not merely an attack --

14            THE COURT:  But the government is not asking

15      for -- I mean, the government is not asking for a period of

16      incarceration for every single person who put his or her big

17      toe inside the Capitol Building, right?

18            MS. ALBINSON:  Yes, Your Honor.  That's correct.

19            THE COURT:  So as I understand it, you know, from

20      the government's papers, putting aside the significance of

21      what happened in the Capitol attack on January 6th; and

22      understanding the fact that the government is not asking for

23      a period of incarceration for every single one of those

24      participants in that mob attack, I understand that the

25      government is asking for a period of incarceration in this

1    case, in part, because of the defendant's five prior

2    convictions.  Is that correct?

3            MS. ALBINSON:  That's correct, Your Honor.

4            THE COURT:  It's his criminal history that you

5    have been focusing on?

6            MS. ALBINSON:  That is correct.  I would say that

7    that is the most significant aggravating factor in this case

8    specific to this defendant, is the fact that he did have

9    five prior arrests on his record at the time that he chose

10   to enter the Capitol Building --

11           THE COURT:  Well, I am not concerned about

12   arrests.  You are talking about the five misdemeanor

13   convictions; is that correct?

14           MS. ALBINSON:  I'm sorry.  I apologize.

15           I misspoke, Your Honor.

16           -- five misdemeanor convictions on his record, for

17   which he had been sentenced to probation on each of those

18   occasions.

19           I do not believe this defendant has served any

20   jail time, and that's one of the reasons why we're

21   requesting it, Your Honor.  Because it doesn't appear, from

22   a reading of the defendant's record, that probation has been

23   a sufficient deterrent for this defendant.

24           THE COURT:  Well, let me just pause you on that

25   because the probation office has indicated, in its

1    sentencing recommendation, that Mr. Stenz was sentenced to

2    one period of imprisonment and placed on community

3    supervision on multiple occasions.  And I do believe that

4    for his possession of marijuana conviction he was actually

5    sentenced to a short period of imprisonment.

6            Are you reading the presentence report differently

7    than that?

8            MS. ALBINSON:  I apologize, Your Honor.  I must

9    have overlooked that.

10           THE COURT:  Well, let's just look and get that

11   cleared up right now, why don't we.

12           MS. ALBINSON:  Okay.

13           THE COURT:  Because if you look at paragraph 27 of

14   the PSR --

15           MS. ALBINSON:  Yes.

16           THE COURT:  -- under "penalty" it says 3 months --

17   he was convicted of possession of marijuana, false report to

18   law enforcement, all in Montgomery County, PA; and he was

19   sentenced to 3 months' probation for the possession of

20   marijuana.

21           But it reads to me as if he were sentenced to one

22   year in imprisonment for the false report to law

23   enforcement.

24           MS. ALBINSON:  Your Honor, you are correct.

25           I apologize.  I must have overlooked that part.

1          I do believe that makes the argument for

2     imprisonment even stronger because if he has already served

3     a year in prison, that didn't dissuade him from committing

4     another crime.

5          He did have an outstanding criminal case in

6     Pennsylvania at the time that he chose -- made the conscious

7     choice to enter the Capitol Building.  He did admit to law

8     enforcement that he knew that it was a crime when he

9     entered.  He knew he was doing something wrong, and he chose

10    to do it anyway.  So --

11         THE COURT:  So it's his combination of his

12    criminal history that he has had five misdemeanor

13    convictions previously, served one period of imprisonment

14    quite some time ago, in 1999; and he was awaiting resolution

15    of charges against him at the time he committed this instant

16    offense on January 6, 2021.

17         So it's that combination of criminal history

18    factors that is part of what's underlying the government's

19    recommendation for 2 weeks' imprisonment?

20         MS. ALBINSON:  That is correct, Your Honor.  Along

21    with the other aggravating factors that the government laid

22    out in its sentencing memorandum which -- I don't know if

23    you want me to go into those right now, but they are -- but

24    the defendant observed people breaking windows outside the

25    Capitol; and that's significant because it's not a situation

1    that we have with many other January 6th defendants where

2    they simply observed the windows already broken.

3         He observed the destruction himself, and he went

4    in anyway.  He would have heard alarms going off at his

5    entry or before.  He said to law enforcement that he saw

6    blood in a fountain, and that's, you know, a very dramatic

7    image; but it shows that he saw evidence of extreme violence

8    before he went in, someone had bled; and he saw it, and he

9    went in anyway.

10        Additionally, he entered an extremely sensitive

11   area of the Capitol; he entered Senator Jeff Merkley's

12   office along with multiple other January 6th defendants.

13        The government is not sure the state of the office

14   when he entered into it.  I don't know if there was a large

15   amount of destruction that Mr. Stenz would have saw -- would

16   have seen when he entered in, but he would have seen the

17   door was torn off the hinges.

18        THE COURT:  And I understand that a computer was

19   stolen from Senator Merkley's office during that invasion by

20   the mob.

21        MS. ALBINSON:  Yes, that's correct.

22        THE COURT:  Has that computer ever been recovered?

23        MS. ALBINSON:  Your Honor, I do not know.  I can

24   try to get that answer for you.

25        THE COURT:  That's okay.  That's okay.  It's not

1    relevant because there is no evidence that this particular

2    defendant -- despite going into Senator Merkley's office --

3    actually stole anything, including a computer from the

4    office; is that correct?

5           MS. ALBINSON:  That is correct.  He did take a

6    picture, a photograph, when he was inside the office.

7           Additionally, he sent text messages to friends and

8    acquaintances that included the photographs that he took

9    while he was at the Capitol, and he later deleted those

10   photographs.

11          He did provide them to law enforcement when he --

12   when his attorney reached out and set up an interview.  The

13   government acknowledges that the defendant did come in early

14   on this case.  Nonetheless, he did --

15          THE COURT:  Let me ask you about that interview.

16   Because one of the things that struck me is that, when

17   Mr. Stenz spoke to the FBI, he said he traveled to D.C. with

18   a friend from his neighborhood.  He drove in the car with

19   this person from Pennsylvania to a train station outside of

20   Baltimore.  He took the train with this friend; he went to

21   the Trump rally with this friend.  He went into the Capitol

22   with this friend; and then he traveled back home with this

23   friend.  And Mr. Stenz told the FBI that he knew this

24   friend's first name only.

25          Has the government learned the full name of the

1    friend who spent all day with Mr. Stenz on January 6?

2           MS. ALBINSON:  The government has, yes, Your

3    Honor.

4           THE COURT:  And did the government learn that name

5    from Mr. Stenz?

6           MS. ALBINSON:  No, Your Honor.

7           THE COURT:  So does the government believe the

8    defendant when he told the FBI he didn't know the full name

9    of the person he traveled with and spent all day with on

10    January 6th during this historic moment in our country's

11    history?

12           Do you believe he didn't know the full name of the

13    friend?

14           MS. ALBINSON:  I think it's unlikely that he

15    didn't know the full name, but I don't know for sure.

16           THE COURT:  Well, it was just interesting to me

17    that in one of the aggravating factors that the government

18    didn't list was the fact that he was not forthcoming during

19    his interview with the FBI about who he was accompanied by

20    on January 6th.

21           Doesn't this defendant in his plea agreement have

22    a cooperation provision?

23           MS. ALBINSON:  He does, Your Honor.  He does.

24           THE COURT:  And would you find failing to provide

25    the full name of the friend or dissembling in an FBI

1    interview is fully compliant with the cooperation provision

2    in the plea agreement?

3              MS. ALBINSON:  Not if he knew the full name, Your

4    Honor.  I would agree with you that it's not fully compliant

5    if he knew his friend's full name.  I don't know --

6              THE COURT:  But the government doesn't believe

7    that that dissembling to the FBI during an FBI interview is

8    an aggravating factor?  It's not mentioned in your briefing.

9    I was curious about that omission, if it was an omission.

10             MS. ALBINSON:  Your Honor, I don't know what he

11   knew.  I think it's unlikely that he didn't know his

12   friend's last name or he couldn't have found out; but I

13   don't know for sure.

14             I would point out that Mr. Stenz -- we did cite in

15   our sentencing memorandum, I believe, that he was in the

16   Capitol for eight minutes.  He told the FBI that he was only

17   there for three minutes; and he did omit the fact that he

18   was in a senator's office.  He said he was in what looked

19   like a bookshop; that I think it's safe to say is not being

20   fully honest.  It's unlikely that someone would mistake a

21   bookshop for a senator's office; and I do believe the

22   government did point that out in its sentencing memorandum.

23   But I don't know for sure if this defendant actually knew

24   the last name of the individual who was with him.

25             The government has --

1          THE COURT:  So let me -- go ahead.  I'm sorry to

2     interrupt you.

3          MS. ALBINSON:  I was going to say the government

4     has identified that person.

5          THE COURT:  And has that person been charged?

6          MS. ALBINSON:  Not at this point, but we are

7     working towards that.

8          THE COURT:  Without any help from Mr. Stenz?

9          MS. ALBINSON:  Correct.

10          THE COURT:  All right.  So the government makes a

11     point of stating in its memo that the gravity of these

12     offenses demands deterrence; this was not a protest.

13          And I do think it bears repeating that what

14     happened on January 6th was not a protest; and it bears

15     repeating, in part, because a major political party has

16     described what happened on January 6th as legitimate

17     political discourse, so I think it bears repeating again and

18     again.  This was not legitimate political discourse; this

19     was not a protest.

20          And yet, at the same time, the government has

21     allowed this defendant and a number of other defendants

22     charged in connection with January 6 to plead to a charge of

23     parading, demonstrating, and picketing in the Capitol

24     Building which suggests that all they were doing was

25     parading, demonstrating, or picketing, but just in the wrong

1     place.

2             So does the government accept some responsibility,

3     in its charging and plea offer decisions, in all of these

4     cases arising out of January 6th for helping to foster some

5     confusion about whether what occurred on January 6th was a

6     protest or legitimate political discourse?

7             MS. ALBINSON:  Your Honor, I certainly don't

8     believe that what occurred on January 6th was a protest or

9     legitimate political discourse; it was, in many senses,

10    terrorism.

11            But we did charge Mr. Stenz with more severe

12    crimes.  He did come in early; we recognized that with

13    allowing him to plead guilty to this petty offense --

14            THE COURT:  Well, there were other petty offenses

15    that would not have helped foster this public confusion

16    about whether the defendants were merely engaging in

17    demonstrating, picketing, and parading.

18            I mean, he was -- Count 3 of the information in

19    this case charged him with:  Willfully and knowingly

20    engaging and disorderly conduct in the Capitol Building with

21    intent to impede, disrupt, or disturb the orderly conduct of

22    Congress; that's in violation of 40 U.S.C. Section

23    5104(e)(2)(D), another subsection of the same statute with

24    the parading, demonstrating, and picketing charge; it's

25    another petty offense, he would have faced the same

1   penalties.  And yet the government has opted -- it's chosen

2   in all of these cases -- to charge the parading,

3   demonstrating, or picketing charge.

4          I just -- look, I understand it's not my role as a

5   judge to make charging or plea offer decisions; it's not my

6   role.  But I have to say, I have been curious throughout the

7   last year why it is, when there are other petty offenses

8   with the same penalties, clearly appropriately applied to

9   the conduct on January 6th and, in fact, charged in the

10  information in this case -- that the government is choosing

11  to offer pleas to "parading, demonstrating, or picketing"

12  when it had other options available to it; and I wanted to

13  give the government an opportunity to explain that choice,

14  if you want to take the opportunity to explain it.

15          MS. ALBINSON:  Your Honor, I think that that

16  question, sort of, gets to the policy decisions of

17  management who are clearly not myself.

18          So I understand your frustration and I understand

19  your argument and your point; but I don't feel like I am the

20  person to address it.  And I apologize, that's not a

21  satisfactory answer.

22          THE COURT:  No, no, no.  I get that.

23          Mr. Pearce, are you the person to address that

24  since you are at the Department of Justice and -- you are in

25  criminal appeals; is that right?

```
 1                    MR. PEARCE:  I am.

 2                    Do you want me to come up to the lectern, Your

 3       Honor?

 4                    THE COURT:  Of course.

 5                    Ms. Albinson, I am going to want you back, so

 6       don't get too comfortable.

 7                    MS. ALBINSON:  Okay.  I won't.

 8                    THE COURT:  And I don't mean to put you in a

 9       uncomfortable position either.

10                    I am very curious, particularly as in the public

11       discourse there continues to be a theme that what happened

12       on January 6th was a protest gone wrong by some people.  And

13       so I want to give the government an opportunity to explain

14       its choice.  I am not second-guessing it.

15                    I am questioning and wondering whether there is an

16       acknowledgment that that choice has helped confuse the

17       issue.

18                    MR. PEARCE:  So --

19                    THE COURT:  And, Mr. Pearce, this may not be your

20       decision either.

21                    MR. PEARCE:  So that was going to be where I was --

22                    THE COURT:  I think you are probably brought in

23       here to talk about a split sentence, as you have in the past

24       in my courtroom.

25                    MR. PEARCE:  I am certainly available to talk
```

1      about that.

2              But the role that I play in this investigation is,

3      sort of, as an appellate advisor for many of these cases to

4      address appellate legal issues.  And so, as Your Honor just

5      indicated, this is a policy-level determination.  So, again,

6      I don't think I am necessarily the best person.

7              I do think I can offer a couple of responses and,

8      beyond that, it may not satisfy the Court's curiosity.

9              THE COURT:  As I said, I want to give the

10     government an opportunity to offer any explanations for its

11     choice -- not just in this case, but more broadly in lots of

12     other cases where the plea offer has been to the petty

13     offense of parading, demonstrating, or picketing, rather

14     than an alternative -- alternative petty offense that would

15     clearly apply, has been charged in these cases regularly,

16     and would not foster the same confusion among the public

17     about what occurred on January 6th.

18             MR. PEARCE:  So I think that it may or may not be.

19             I mean, it's obviously an empirical question

20     whether the government's charging decisions -- and

21     ultimately not so much charging decisions, but decisions in

22     terms of what to permit or offer in plea negotiations with

23     defendants, what to accept.

24             I don't think it is the government's role to be

25     engaged with, sort of, the political conversation about the

1   political significance of January 6th.  What we are doing is

2   ensuring criminal responsibility for what happened on

3   January 6th.

4          Now, it may be that certain individuals take a

5   look at the name of 5104(e)(2)(G) and say:  Oh, it looks

6   like this is just -- as I think you basically described --

7   sort of a protest gone awry; and that is all that the --

8          THE COURT:  Yes.  But even in the elements that

9   the government is proffering for the charge to parading,

10  demonstrating, and picketing, the government is saying that

11  it is not at all required in the elements that there be any

12  disruption to Congress.  It's just basically saying:  You

13  are parading, demonstrating, or picketing in the Capitol

14  Building, and you did that knowingly.  It's basically --

15  they're not even in the elements that they're saying are

16  sufficient for that charge saying that it required any

17  disruption of Congress's proceedings.

18         MR. PEARCE:  That's true.  And I mean, I think, as

19  the Court is well aware, it is not unusual in any criminal

20  matter for the government to bring a number of charges and

21  ultimately, in the back and forth of plea negotiation, to

22  agree to a plea that does not encompass the full panoply of

23  the defendant's criminal conduct.

24         And then, when we get to this point, sentencing,

25  it's certainly fully before the Court under 3553 to take all

1      of that into account.  It's certainly the government's

2      obligation to bring to the Court's attention all of those

3      factors -- in Mr. Stenz's case, you know, things unrelated

4      to January 6th, like his background; and then also things

5      related to January 6th, like the specifics of fact of where

6      he went in the Capitol, the actions that he took, what he

7      observed, things like that.

8              That -- in some respects, the way that the

9      government has proceeded with January 6th is really no

10     different than how we have proceeded with criminal

11     investigations and prosecutions generally.

12             Again, we have charged what we believe we can

13     prove beyond a reasonable doubt and, in case-specific

14     reasons, have it read --

15             THE COURT:  Well, what strikes me, Mr. Pearce, is

16     that the demonstrating, picketing, and parading charge is

17     often the ticket given to people who stand up in the middle

18     of a hearing and yell or disrupt a hearing in some way and

19     does -- you know, that's -- it's a typical charge in those

20     kinds of cases.  It's not -- I was surprised to see them

21     brought in the January 6th cases.

22             And I take it from what you are saying is that the

23     government does not acknowledge any responsibility in the

24     confusion in some parts of the public about whether it was

25     just a protest on January 6th that may be due, in part, to

1    the fact that its primary petty offense charge that it's

2    offering its pleas to dispose of these cases is the

3    parading, picketing, and demonstrating charge; that's the

4    bottom line, is that right?

5              MR. PEARCE:  Well, I can say that that was

6    certainly not our intention.

7              The empirical question of whether it, in fact, has

8    fostered confusion I am agnostic on; I just don't know.

9              It is possible -- as Your Honor has suggested, it

10   is possible that no one has really paid much attention to

11   whether the specific charges underlie or, at least, can, in

12   some ways, be seen to support a view that what happened on

13   January 6th was legitimate political discourse.

14             I can say affirmatively and strongly that, as we

15   have consistently said -- the way the government speaks in

16   court and through its filings -- we do not believe that what

17   happened was a protest.  We do not believe it was legitimate

18   political discourse; it was a criminal event.  It was, in

19   many respects, an act of domestic terrorism.  Not everyone

20   was engaged in domestic terrorism, but that is something

21   that we have said in court and I will say again here.

22   Whether those --

23             THE COURT:  I would say that there is probably no

24   question that there were people who were legitimately inside

25   the Capitol Building who were terrorized.

1           MR. PEARCE:  I think that's absolutely correct and

2     certainly have said that before Congress and publicly.

3           So to the extent our charges may have created any

4     confusion, I can apologize because I can, with full

5     confidence, say that was -- certainly was not and continues

6     not to be our intention; whether it has, I don't know.  But

7     that is certainly not something that we have intended

8     through any of our charging or prosecuting decisions.

9           THE COURT:  All right.  So, Mr. Pearce, while I

10    have you up here, let's talk about split sentences.

11          MR. PEARCE:  Okay.

12          THE COURT:  We have had this conversation before.

13          MR. PEARCE:  We have.

14          THE COURT:  And the only written opinion from one

15    of my colleagues in this case on the split sentence was

16    Judge Colleen Kollar-Kotelly's decision that it wasn't --

17    that split sentences for -- the split sentence bar applies

18    to petty offenses just as much as it applies to Class A

19    misdemeanors and felonies.

20          Have I missed any other decisions by my colleagues

21    adopting the government's position that a split -- the split

22    sentence bar does not apply to petty offenses?

23          MR. PEARCE:  So, to my knowledge, that is the only

24    written decision.

25          And, no, none of your colleagues have imposed a

 1    split sentence.  Some have asked for additional briefing or,

 2    more specifically, we have put something similar to what we

 3    put in the sentencing memo before Your Honor in this case;

 4    and some of your colleagues have asked for additional

 5    briefing from defendants.  But that is the only written

 6    opinion of which I am aware on the split sentence issue.

 7            THE COURT:  All right.  And although the

 8    government is inviting me, again, to make a decision that

 9    the split sentence bar does not apply to petty offenses in

10    this case, I don't have to resolve that question here; isn't

11    that right?

12            Because I can also -- if I thought 2 weeks'

13    incarceration as recommended by the government was

14    appropriate in this case, I can simply do it as a special

15    condition of probation, under 18 U.S.C. Section 3563(b)(10).

16            Do you agree with that?

17            MR. PEARCE:  I do.

18            THE COURT:  All right.  That's all I want to say

19    about split sentences.

20            MR. PEARCE:  Thank you, Your Honor.

21            THE COURT:  Thank you.

22            Ms. Albinson, I want to give you an opportunity to

23    conclude any things that you want to say about sentencing in

24    this case before I turn to Mr. Marrone.

25            MS. ALBINSON:  Thank you, Your Honor.

```
 1                  I believe that I actually said everything that I
 2        wanted to say before.  Thank you very much.
 3                  THE COURT:  Okay.  Thank you.
 4                  Mr. Marrone.
 5                  MR. MARRONE:  Your Honor, would the Court grant a
 6        brief recess so I can run to the restroom.
 7                  THE COURT:  Yes.  I will give you five minutes.
 8                  MR. MARRONE:  A few minutes; it doesn't have to be
 9        long.
10                  THE COURT:  Okay.  Mr. Stenz, if you want to use
11        the restroom also, you may do so.
12                  THE DEFENDANT:  No.  Thank you, Your Honor.
13                  (Whereupon, a recess was taken.)
14                  THE COURT:  All right.  Mr. Marrone, you can step
15        forward to the podium.
16                  MR. MARRONE:  Good morning, Your Honor.
17                  THE COURT:  Good morning.
18                  MR. MARRONE:  So I am here this morning on behalf
19        of Mr. Stenz not to make excuses for what has happened or
20        what he did; obviously, he has taken full responsibility.
21                  But to clarify factually what has happened and how
22        we got here today --
23                  THE COURT:  Well, perhaps you can start with one
24        of the aggravating circumstances that the government has
25        pointed out, which is that when Mr. Stenz engaged in the
```

1    criminal conduct on January 6, 2021, he had criminal charges

2    pending against him in Pennsylvania for falsifying records

3    related to the purchase of a firearm and that he chose to

4    enter the Capitol anyway; and, in fact, within weeks of the

5    January 6th attack on the Capitol, he pled guilty in that

6    case in Pennsylvania.  He was sentenced to a period of

7    probation; and he just got off of probation in that case.

8            Clearly, sentencing judges in every court in this

9    country, state or federal, in assessing the risk of

10   recidivating, take seriously how extensive a defendant's

11   criminal record is, whether the defendant is going to be

12   law-abiding in the future.  And defendants who commit new

13   offenses while under investigation or pending charges in

14   another case are a big red flag.

15           So shouldn't I be concerned about Mr. Stenz

16   committing -- facing criminal charges in Pennsylvania for

17   trying to purchase a gun with false information about his

18   criminal record, and then engaging in this Capitol

19   offense --

20           MR. MARRONE:  Your Honor --

21           THE COURT:  -- I don't want to say "Capitol" --

22   engaging in an offense at the Capitol --

23           MR. MARRONE:  Judge --

24           THE COURT:  -- while he was still facing those

25   charges?

1          MR. MARRONE:  -- in laymen's terms, it's not a

2      good look.

3          THE COURT:  It's not a good look.

4          MR. MARRONE:  Exactly.

5          But that being said, the origin of this specific

6      charge that he had which, in his mind -- and it's a mind

7      sometimes of stupidity -- he was trying to purchase a gun.

8      And there are facts in there that his daughter was held at

9      gunpoint at some point, and she wanted to learn how to

10     shoot, so he wanted to purchase a gun.

11         He fills out an application believing misdemeanors

12     are not the same as felonies.  That's not accurate, we know

13     that.  That's somewhat stupid.  The question was:  Were you

14     ever charged with a crime?  He fills it out; he falsifies

15     the document, and he gets charged.  That's the underlying

16     reason of this crime.  It doesn't make an excuse for it; it

17     doesn't make it okay, but that's what this was.

18         The fact that -- and by the way, through all of

19     the information we submitted, it's clear that Mr. Stenz is

20     not a political man; that he got caught up, maybe, in the

21     hoopla and the interest of going down to a rally.  And by

22     the way, he went with one of his children's friends --

23         THE COURT:  Well, let me just say, I know that

24     there are friends and family members who submitted letters

25     saying he was not a political man.  But somebody who

1    travels -- you know, makes arrangements with a friend who he

2    only knows by his first name apparently -- travels down

3    here, goes to a rally, then follows a mob to the Capitol, I

4    mean, that's --

5              MR. MARRONE:  Judge, not --

6              THE COURT:  -- it's hard for me to accept that

7    characterization.

8              MR. MARRONE:  -- there is no question of what this

9    ultimately became and what the underlying premeditated ideas

10   were with some of the people there.

11             But on a national level, what was happening that

12   day and what this President created from an intrigue

13   standpoint, going down to a rally if you had the free time

14   and you want to do that and participate -- and there is no

15   other evidence presented to the Court that he had any other

16   ideas.  And he openly admits he went down with a friend -- a

17   person from the neighborhood; it wasn't his friend, it was

18   one of his daughter's friends.  And what ensued after that

19   is what it is.  It's something he shouldn't have done.  And

20   I think it, kind of -- he was honest about what had

21   happened, which takes me to --

22             THE COURT:  So let's talk about the friend.

23             MR. MARRONE:  Sure.

24             THE COURT:  And please keep your mask on, covering

25   your nose and your mouth, please.  I am very, very serious

1     about the safety of the staff, including my courtroom

2     deputy, my court reporter -- everybody else in this

3     courtroom.

4               MR. MARRONE:  I understand.

5               THE COURT:  Keep your mask on.

6               All right.  Let's talk about this friend.

7               I am very skeptical that Mr. Stenz told the truth

8     to the FBI when he said he only knew this friend's name --

9     first name and not his full name.

10              Do you want to address that?

11              MR. MARRONE:  That's absolutely -- yes, I will

12    address that.

13              When -- and I have to preface it this way.  When

14    he realized -- after he left, when he got home, and he knew

15    this was something bad, and no one was knocking on his

16    door -- he talked to his family who are involved in the

17    community, have jobs -- and he said, Listen, I have to come

18    forward.  And he contacted an attorney, which was me.

19              Nobody called me.  I sought out law enforcement.

20    I called down to Washington.  I looked for someone.  They

21    didn't get back to me for weeks until they finally reached

22    out to an agent in the Eastern District to call me and set

23    up a meeting which we wanted to do.  We wanted to come

24    forward and speak about what happened, whatever his

25    involvement was, et cetera.

1    They finally came to my office.  And he came to my

2    office with his wife, his cell phone, and any information he

3    had.  And we spent well over an hour and a half in my

4    conference room, two hours, providing all of the information

5    he knew; gave them everything.  He had absolutely no reason

6    to mislead or give false information.

7    In fact, he wanted to tell the government

8    everything he knew.  He wanted to admit to what he did, and

9    he wanted to come forward; and that's what he did.  That's

10   exactly what happened; that's how we got here today.

11   So as far as this person he was with, he only knew

12   the person's first name; it was one of his children's

13   friends.  He could -- if you ask him today what that

14   person's last name is, he still can't tell you; and, Your

15   Honor, I am sure at some point he will speak.  That is the

16   truth.  Now whether Your Honor wants to believe that, all we

17   can do is tell you the truth.

18   So that's how we got here today.  So just so the

19   Court understands the evolution of how Mr. Stenz got to this

20   case, that's exactly what happened; we sought government

21   out.

22   THE COURT:  All right.  So let's turn to his

23   conduct while he has been on pretrial release here.

24   He submitted a tampered with or diluted urine

25   sample on June 24th, 2021, to pretrial services; and, at

 1     that point, he admitted to using THC daily when he was not

 2     supposed to as a condition of his pretrial release.  And to

 3     his credit, he stopped, apparently.  He had clean urines

 4     after that discovery by pretrial services.  And they told

 5     him he was not allowed to use THC while on pretrial release.

 6              But this wasn't just a situation where he was

 7     caught using THC when he wasn't supposed to on pretrial

 8     release.  He actually took steps to subterfuge -- to dilute

 9     his urine -- to try and mask the fact that he was violating

10     his conditions of supervised release.

11              What am I supposed to make of that?

12              MR. MARRONE:  Well, he has a medical card; and he

13     was using it before this happened.  And I think he -- and it

14     does help with his anxiety; he was under a lot of anxiety.

15     And he was trying to get himself off of it and comply, and

16     that was the best that he could do.  He did actually finally

17     get himself off of it, even though it was a need that he

18     had.  That's -- you know, he doesn't -- he then took the

19     test; he tested negative.  He doesn't use it in compliance

20     with pretrial services and he --

21              THE COURT:  But he was using THC daily through

22     vaping; and he is seen clearly on the video evidence in this

23     case vaping --

24              MR. MARRONE:  Sure.

25              THE COURT:  -- walking into the Capitol Building

1   taking puffs.

2            Was Mr. Stenz high on January 6th when he went

3   into the Capitol Building?

4            MR. MARRONE:  I think you are going to have to ask

5   him.  But I don't -- was he relaxed?  Is that something that

6   he needs with his anxiety; the answer is probably yes.

7            Whether he was at the Capitol Building or he was

8   home or he was at an event, he did that on a regular basis;

9   it was something that gave him relief.  And I think that's

10  relatively common in society today, so I don't think that

11  should be held against him.

12           THE COURT:  All right.  Well you've focused a lot

13  in your sentencing memo on the fact that he was only in the

14  Capitol Building for eight minutes.

15           MR. MARRONE:  That is correct.

16           THE COURT:  And you are right, that's not a

17  terribly long period of time.

18           But what is more probative in some ways of

19  evaluating culpability for conduct on January 6th with so

20  many people inside the building, some of whom were there for

21  a short period of time was:  What were they doing when they

22  were inside?

23           So we have this defendant vaping -- probably THC,

24  because that's what he admits he was using daily.  And one

25  of the factors that the government points out as being

1     aggravating is that he didn't just stay in the public

2     hallways of the Capitol.  He went into a private office of a

3     senator which -- from the video that Senator Merkley took of

4     that office; it was trashed.  There were papers all over the

5     place; a computer was stolen.  There was detritus of people

6     smoking and leaving their cigarettes butts on tables, on the

7     floor.  It was totally disrespectful conduct by the mob that

8     went in there; and this defendant was part of that mob that

9     went into Senator Merkley's office.

10            Isn't that an aggravating circumstance here, as

11    the government points out?

12            MR. MARRONE:  Your Honor, I think it's clear in

13    the memo that there is no evidence whatsoever that he

14    contributed to any destruction of property.  They have

15    video; they have film.

16            He obviously admits to being in there for eight

17    minutes, to walking around, to walking into an office -- he

18    didn't know whose office it was.  I think he even admitted

19    he touched a book when he had the interview.  So, I mean,

20    all he can do is tell the truth at that point.  I think it's

21    clear that he had no intent nor did he do anything damaging

22    or destructive.

23            I think what he did was he went into a building he

24    was not permitted to go into and probably knew that and had

25    seen what was going on.

1          THE COURT:  Well, did Mr. Stenz see anybody steal

2     the laptop from Senator Merkley's office?

3          MR. MARRONE:  To my knowledge, no.

4          Obviously, Your Honor -- again, we reached out to

5     the FBI with the intent to be open, clear, and give all of

6     the information we knew.  He spent a long time in my office

7     talking to them; he had no reason to withhold any

8     information at that point in time; he gained nothing from

9     it.

10          THE COURT:  All right.  So the government does

11     give him some credit for turning himself in about two weeks

12     after the Capitol attack; but says that two days before

13     that, the FBI had already received a tip about his identity

14     and that he was inside the building on January 6th.

15          MR. MARRONE:  But that's --

16          THE COURT:  Was the defendant aware --

17          Don't interrupt me.

18          MR. MARRONE:  I'm sorry, Your Honor.

19          THE COURT:  This may be okay in courts you usually

20     practice in, it is not okay in my courtroom.

21          MR. MARRONE:  I apologize, Judge.

22          THE COURT:  And just to alert you, when you speak

23     over me, my court reporter takes down what I say so your

24     words are lost forever.

25          MR. MARRONE:  I apologize.

1          THE COURT:  So let me finish my question.

2          Was the defendant aware that law enforcement was

3     closing in on him before he turned himself in?

4          MR. MARRONE:  No, Judge.

5          THE COURT:  All right.  Mr. Stenz told the FBI

6     that he supported former President Trump and felt that the

7     election had been stolen from him -- this is what he said,

8     despite the fact that you say he is not political; but he

9     certainly was political enough then.

10          So the former President and other of his followers

11    are still saying that the 2020 presidential election was

12    stolen, despite all evidence to the contrary.  So does the

13    defendant, who was inspired by these beliefs, engaged in

14    this political mob attack on the Capitol on January 6,

15    2021 -- does he still believe that the 2020 election was

16    stolen?

17          MR. MARRONE:  Well, Your Honor, I think that's

18    something you maybe have to ask him.  But I --

19          THE COURT:  But in assessing his risk of engaging

20    in other mob violence, political violence -- politically

21    motivated --

22          MR. MARRONE:  No, Your Honor.

23          THE COURT:  I mean, it is relevant as to -- what

24    motivated him before was -- what he admits was that he

25    followed former President Trump; he felt the election had

1    been stolen.

2         So in assessing his risk of repeat conduct, is

3    that still his belief?

4         MR. MARRONE:  In fact, it's to the contrary, Your

5    Honor.  If you would ask the defendant, he would tell you

6    that not only is he not a political person historically, he

7    has not involved himself with -- to any level the way he did

8    here with any previous elections.  And subsequent to this,

9    he has -- kind of detached him [sic] from the political

10   process.  He doesn't find himself engaged whether watching

11   CNN, Fox, or any of those shows; he does not do that any

12   longer.

13        He has focused his complete efforts in taking

14   interest in supporting his family, working, and doing the

15   things that he has done his whole life.

16        THE COURT:  All right.  So the defendant says he

17   still just knows the first name of the fellow he spent all

18   day with on January 6th and traveled with on January 6th.

19        But if you look at Government's Exhibit 2 -- that

20   video closely -- he's actually seen, when he enters the

21   Capitol, walking over to another man, giving that man a fist

22   bump; chatting with that person.  It appeared like he knew

23   not just the fellow he traveled with, but somebody else

24   inside the Capitol Building.

25        Did he see other people he knew when he was inside

1    the Capitol Building --

2               MR. MARRONE:  No, Your Honor.

3               THE COURT:  -- including that person he had a fist

4    bump with and chatted with?

5               MR. MARRONE:  No, Your Honor.

6               Your Honor, that day -- it was a spur of the

7    moment.  In his neighborhood there happened to be a young

8    person, friends with his children, that had an interest in

9    the Trump rally.  He was off that day; they got on a train.

10   They went down to the rally strictly to support the whole

11   process.

12              What had happened subsequently, obviously, he is

13   not proud of and he has no defense to, but he has been

14   apologetic.  And he has come forward and provided all of the

15   information he knows truthfully and accurately.

16              THE COURT:  All right.  Is there anything else you

17   want to add before I hear from Mr. Stenz?

18              MR. MARRONE:  Yes.  We would just ask the Court to

19   consider his family history; all of the letters submitted

20   which we think are significant; his long-standing

21   relationship with his wife; his three children; his

22   employer's support.

23              Again, he is a hard-working man, he supports his

24   family, his friends.  And also support from -- he is also in

25   a prayer group, which shows that he is also a Christian man;

1    that this is not a man that is a terrorist or anything of

2    that nature that we think the Court may view him in.

3              As far as his criminal history --

4              THE COURT:  Well, you would agree, though, that

5    people who are legitimately working inside that Capitol

6    Building, the Vice President, the members of Congress, their

7    staff, the media -- children who were there watching this

8    historic event -- who were evacuated, hid under tables,

9    behind locked doors -- you would admit they were terrorized,

10   right?

11             MR. MARRONE:  No question, Judge.  No question.

12             And he is embarrassed by that and he feels

13   horrible about it; and it's something he didn't want to be

14   part of.  That's why -- from a short period of time when he

15   got home -- he reached out to an attorney to reach out to

16   the government to come forward; that's a fact of what

17   happened.

18             So we would hope the Court would at least take

19   that into consideration to show you at least what type of

20   man Mr. Stenz is in comparison to the other people that were

21   there.

22             Just in conclusion, Judge, I know the government

23   has spoke a lot about his criminal history; something,

24   again, that he is not proud of; he accepts responsibility.

25             There are five previous charges; one is a DUI --

1          THE COURT:  It's not just charges, they are

2     convictions.

3          MR. MARRONE:  Convictions, misdemeanor

4     convictions.

5          One was a DUI conviction; another one was driving

6     in a vehicle with marijuana.  The other one, which,

7     ultimately, was --

8          THE COURT:  And the marijuana possession got him

9     3 months' probation; but it was the other charge associated

10    with that offense conduct -- somehow falsifying information

11    to law enforcement -- that got him -- I think, as I

12    understand the PSR correctly -- that got him a year in

13    prison; is that right?

14         MR. MARRONE:  No.  One week, Judge.

15         THE COURT:  It was just one week?

16         MR. MARRONE:  Yes, Your Honor.

17         THE COURT:  So why does the -- so is that a

18    correction to the PSR --

19         MR. MARRONE:  I believe so.

20         THE COURT:  -- where it says one year?

21         MR. MARRONE:  Yes.  He explained that to me a

22    couple of minutes ago.

23         THE COURT:  I'm sorry.  I can't understand you.

24         MR. MARRONE:  I just found that out.  It's one

25    week, Judge, to be clear.  Because I know the government

1    said it was a year.

2            THE COURT:  Well, it's not the government that

3    said that.  I was reading the paragraph in the presentence

4    investigation report, at paragraph 27, that says -- on

5    Count 1, which is the marijuana possession, he was sentenced

6    to 3 months' probation.  For Count 3, which was the false

7    report to law enforcement, he was sentenced to one year

8    imprisonment, and an $813.10 fine, and $462.82 costs.

9            So you are saying that that was not one year, that

10   was a one-week imprisonment?

11           MR. MARRONE:  Yes, Judge.  Yes, Your Honor.

12           THE COURT:  Okay.  Well, while you are here, for

13   clarification, is the probation officer on?  Ms. Lustig?

14           She was on before.

15           MS. LUSTIG:  Yes, Your Honor.

16           THE COURT:  Yes.  Ms. Lustig, can you shed any

17   light on this?

18           MS. LUSTIG:  Your Honor, that is the information

19   that we received from the Pennsylvania probation -- the USPO

20   in Pennsylvania that did the collateral record check for us;

21   that is the information we received from them.

22           THE COURT:  I see.  And you saw a certified

23   judgment and conviction order or judgment and commitment

24   order from Pennsylvania that reflects a 1-year imprisonment?

25           MS. LUSTIG:  I am looking through the criminal

1    records now, Your Honor.

2              THE COURT:  All right.  I don't have time to take

3    more time with this, Ms. Lustig.  But I take it you feel

4    confident in the documentation that you have about the term

5    of imprisonment imposed?

6              MS. LUSTIG:  Yes, Your Honor.

7              I didn't have any reason to question it when I was

8    completing the presentence report.  If it had been an

9    issue -- if defense counsel had brought it to my attention

10   previously, then I would have been able to look into it and

11   have a definitive answer.  But as of right now, I am

12   looking -- all I can do is look through the documentation

13   that they sent me, which is a little voluminous, and try to

14   get any --

15             THE COURT:  Right.  Okay.  Thank you very much,

16   Ms. Lustig.

17             This is the reason, Mr. Marrone, that it's very

18   important to let us know if there are any objections to any

19   part of the presentence report so we can resolve it before

20   taking time at the sentencing hearing.

21             All right.  Is there anything further before I

22   hear from Mr. Stenz?

23             MR. MARRONE:  No, Your Honor.

24             THE COURT:  Mr. Stenz, please step forward.

25             THE DEFENDANT:  Good morning, Your Honor.

1      THE COURT:  Good morning.

2      THE DEFENDANT:  I would just like to say I am

3  sorry to the Court, D.C.

4      I only spent five days in jail in 1999; and I got

5  a year's probation after that for the false reports.  I was

6  in jail because I couldn't call home collect.  My wife

7  reported me missing; that's what happened in that incident.

8      I have never gotten really -- the other charges --

9  I have been in trouble most of my life -- had all probation;

10  never violated.

11      I am kind of embarrassed to be here today and

12  waste everybody's time -- not only for myself, but for

13  everybody, for the state of D.C.; the whole situation was

14  bad.

15      I was in Key West with my son about a week after

16  the January 6th thing, and I realized then it was just

17  really a horrible moment in history; and that's when I

18  reached out to Mr. Marrone when I got home.

19      As far as the kid, Carson -- I don't know his last

20  name -- 'til this day.  He's just from our neighborhood, a

21  young kid; he's got Trump stuff on his lawn, and all.

22      After I talked to the FBI, I was told not to have

23  no contact with the kid; and I have not had contact with him

24  since -- by the judge's orders and my attorney, they just

25  told me no contact.

1          I am sure if I could ask my daughters they

2     probably know his name, but I don't know the kid's name.  He

3     is maybe 20-something years old.  He is just a big Trump

4     guy.  We went down to the rally.  I ended up in the Capitol

5     Building.  I didn't know anybody else there except for

6     this -- my friend.

7          I was not vaping marijuana in the building.  I was

8     into vaping cigarettes.  I do smoke marijuana.  I just got

9     my medical card in May.  I had to pee clean for the pretrial

10    lady.  I got my medical card through the guys at work

11    because I have a CDL.

12          The next time I went down and seen Tara [sic],

13    that's when I had a dirty urine.  And they told me next time

14    I come back, it better be clean because the feds don't see

15    [sic] the Pennsylvania medical card.  So I thought I was

16    doing the right thing.  I had to pee clean the first time

17    because through my work I have a CDL; and they have me go

18    out for randoms occasionally because I drive equipment.

19          And that's about where I am standing today, Your

20    Honor.  I'm sorry to waste the Court's time on my matter.

21          THE COURT:  Well, you did, after January 6th, send

22    a bunch of photographs that were taken --

23          THE DEFENDANT:  I was -- yes.

24          THE COURT:  -- to a group of friends, right?

25          THE DEFENDANT:  Yes, ma'am.  Yes, Your Honor.

1        THE COURT:  And did you send all of those photos

2   to your friends because you were proud of what was going on,

3   and your participation in January 6?

4        THE DEFENDANT:  Your Honor, when I first left D.C.

5   that day, I left the Capitol Building -- I wanted to get out

6   of here as fast as I could.  I felt a little wound up for

7   the first day or two, maybe three.  Even my wife said I was,

8   like, wound up.  I felt like I was part of something.  After

9   about a week later, I felt ashamed.

10       I was in Florida with my son, just watching the

11  regular news and, you know, I just didn't want to be part of

12  it.  I reached out to Mr. Marrone.  And he said:  Oh, well,

13  maybe we'll wait until they come and arrest you.  I said,

14  no, I really -- I seen on TV, they said turn yourself in; do

15  the right thing.  It's the FBI, the federal government.

16       This is, like, one of the darkest days probably

17  our country has seen in a long time -- maybe forever.  And I

18  just wanted to dissociate myself from it.

19       There is no excuse for what I did when I went in

20  there.  I knew I was crossing the line after I seen

21  everything get opened up by the guys standing next to me,

22  and it's on YouTube, and stuff like.  After about 10, 15

23  minutes, I went in -- it seemed like 3 minutes, but I guess

24  it was 8.  I didn't stay in there long.  I just seen

25  everybody trashing the place, and I just wanted to get out.

1          THE COURT:  In terms of you seeing people trashing

2     the place, did you see people trashing Senator Merkley's

3     office?

4          THE DEFENDANT:  I was in that office.  Guys were

5     telling me to have a seat when I was in that office.

6          I did not know -- I thought maybe it was a library

7     or a bookstore.  I don't know where I was at.  I have never

8     taken a school trip to D.C.  I don't know if I went in the

9     front or the back of the Capitol Building until this day.

10          I don't know which entrance -- I went in that door

11     about ten minutes after it opened up, and everybody else was

12     streaming in and out.  And I, kind of, took a look around,

13     and I -- kind of, like, ashamed of what everybody was doing.

14     Everybody telling me to have a seat.  Come on, man, this is

15     our house, stuff like that.  That's when I got out of there.

16          It's true, when it first happened, I felt like I

17     was part of something; but after a while, I felt ashamed of

18     it.  It's not really a proud moment in my life.

19          THE COURT:  So one of your friends wrote to me on

20     your behalf and said that you went to D.C. on January 6th

21     because you -- and I quote your friend:  Simply wanted to

22     witness a historic and disputed certification of electoral

23     votes and intending to exercise your First Amendment right

24     to protest; that's from a person named Dr. Carey Walsh [sic].

25          Do you understand that what happened on

1  January 6th was not a protest?

2        THE DEFENDANT:  At the Trump -- at the Ellipse was

3  a protest.

4        What happened at the Capitol Building was far

5  beyond the protest.  It was really horrible.  I don't know

6  how I got through that crowd to get up to the top.  I don't

7  know how it happened.  It's just -- I slid right through the

8  crowd.  I don't know how I got --

9        THE COURT:  So what happened to change your

10  understanding that what you were doing at the Capitol on

11  January 6th was not a protest?

12        THE DEFENDANT:  I completely agree.

13        I mean, the ways the guy were hanging off the

14  scaffolding, climbing the walls -- it was kind of, like,

15  mayhem; and it just drawed me in.  I don't know if it's the --

16        THE COURT:  But what you -- what changed your

17  mind --

18        THE DEFENDANT:  I know -- I believe in God.  I

19  know that's not what I should have done.  You know, I got,

20  kind of, lured into something; I didn't understand what was

21  going on.

22        THE COURT:  Right.  So, Mr. Stenz, you have told

23  me that when you were there --

24        THE DEFENDANT:  Yes, ma'am.

25        THE COURT:  -- you were -- you know, you felt like

1    you were a part of something.  Afterwards, you shared the

2    photographs; you were wound up; you still felt part of

3    something.

4             And at this point, you feel ashamed and you

5    understand it was not a protest.  What -- what --

6             THE DEFENDANT:  Within days, Your Honor --

7             THE COURT:  -- how do you explain your change of

8    perspective on what happened on January 6th?

9             THE DEFENDANT:  Within less a week, when I was in

10   Key West with my son, I realized it was really a bad

11   situation I got caught up in -- not even a week later.

12            THE COURT:  All right.  Is there anything further,

13   Mr. Stenz?

14            THE DEFENDANT:  No, Your Honor.  Sorry to waste

15   your time.

16            THE COURT:  All right.  You can stay right where

17   you are.

18            Mr. Marrone, you can stand with your client.

19            We are now at the final part of the sentencing

20   hearing.  I am going to explain the sentence I am about to

21   impose, and then I am going to impose sentence, Mr. Stenz.

22            THE DEFENDANT:  Yes, Your Honor.

23            THE COURT:  So after considering the sentencing

24   memorandum that has been -- well, I should -- I am skipping

25   Ms. Albinson.

1          Do you have anything that you want to say,

2     Ms. Albinson?

3          MS. ALBINSON:  No, Your Honor.  Thank you.

4          THE COURT:  All right.  Thank you.

5          So I have considered the sentencing memoranda that

6     have been submitted by the government and on your behalf.  I

7     have looked at all of the letters that have been submitted

8     on your behalf, Mr. Stenz.  I have reviewed the presentence

9     investigation report and the sentencing recommendation from

10    the probation office.

11         So I now have to discuss my consideration of the

12    factors that Congress has said that sentencing judges should

13    address under 18 U.S.C. Section 3553(a) and ensure that I

14    impose a sentence that's sufficient but not greater than

15    necessary to comply with the purposes of sentencing.

16         And it's worth reminding you what the purposes of

17    sentencing are.  Those purposes include the need for the

18    sentence imposed to reflect the seriousness of the offense;

19    to promote respect for the law; provide just punishment for

20    the offense; to deter criminal conduct; protect the public

21    from further crimes by you, Mr. Stenz; and promote

22    rehabilitation.

23         So I have to -- pursuant to 18 U.S.C. Section

24    3553(a) -- consider the nature and circumstances of the

25    offense; your history and characteristics, Mr. Stenz; the

1   types of sentences available; the need to avoid unwarranted

2   sentence disparities among defendants with similar records

3   found guilty of similar conduct; and the need to provide

4   restitution to any victims of the offense.

5          I am going to begin with the restitution amount

6   here.  Given that the statute of conviction is a petty

7   offense, it's not covered by the two general restitution

8   statutes codified at 18 U.S.C. Sections 3663 and 3663(a); so

9   I have no authority to determine any restitution amount.

10  It's limited to what you and the government agreed to in

11  your plea agreement; and the plea agreement provides for a

12  restitution payment of $500 which this Court will order

13  pursuant to 18 U.S.C. Section 3663(a)(3).

14         So regarding the nature and circumstances of the

15  offense, you have been convicted of parading, demonstrating,

16  and picketing in a Capitol Building, in violation of 40

17  U.S.C. Sections 5104(e)(2)(G), which is a petty offense

18  Class B misdemeanor which has some repercussions for the

19  kinds of sentences that are available -- kinds of sentences

20  that are available for the Court to impose.

21         And as I have made clear before, though this

22  defendant pleaded guilty to a criminal statute titled:

23  Parading, demonstrating, or picketing in a Capitol Building,

24  what happened on January 6, at the U.S. Capitol, was not

25  protected First Amendment speech; it was not First Amendment

1    protected parading, demonstrating, picketing, or protesting.

2            The defendant's criminal conduct helped facilitate

3    a riot that overwhelmed law enforcement and succeeded in

4    disrupting the proceedings of Congress to certify the 2020

5    presidential election, at least for a period of time.

6            This defendant traveled from Pennsylvania, joined

7    the mob intentionally, knew following the crowd into the

8    Capitol was unlawful.  As he said, it crossed the line; it

9    certainly did.

10            As he approached the Capitol Building, he saw all

11   sorts of angry people climbing scaffolding -- being "crazy,"

12   I think is the word you used; breaking windows; being

13   disruptive; disorderly; rioting.

14            But despite witnessing this mayhem while still

15   outside the Capitol, Mr. Stenz deliberately and

16   intentionally decided to enter the building anyway, through

17   the same entrance that had been breached earlier by members

18   of the mob; and then he saw people trashing the place.  He

19   told the FBI he saw people urinating on the floor.  This is

20   not a protest.

21            Defendant immediately joined this trashing of the

22   place.  He took puffs from a vaping device, smoking inside

23   the Capitol Building.

24            Just seconds after entering the Capitol through

25   the Senate wing door -- it's clearly shown on Government

1    Exhibit 2, on the video -- he is seen smiling in the CCTV

2    footage, apparently not alarmed or preoccupied by the

3    trashing and the craziness of the mob around him.  He looked

4    very calm; like it was part of the party inside the Capitol

5    that day, from the videos.

6         After making his way through the Senate wing door

7    lobby, he entered Senate Office S140, which is the office of

8    Jeff Merkley of Oregon.  And while inside this office, he

9    took a photo which he later shared with others via text

10   message.  He said he only stayed inside the office for about

11   four minutes; and there is no evidence that he contributed

12   to the damage inside Senator Merkley's office.  But his

13   entry in such a sensitive space -- private space in the

14   building -- is significant.  And he was sufficiently pleased

15   with himself that he took a photo while he was inside

16   Senator Merkley's office.  This senator's office was

17   trashed.

18        There is an exhibit that Senator Merkley took of

19   the trashing of his office with the door broken; items are

20   torn off the wall.  As I already said, there is smoking --

21   butts and ash and stuff on the floor and on the table, and a

22   computer was stolen.

23        This defendant's entry into the senator's personal

24   office, however brief, sets his conduct apart from those of

25   other defendants who only marched through public corridors

1    or other public spaces within the Capitol.

2         This defendant also made his way to the crypt

3    inside the Capitol where he posed for a selfie, along with

4    the friend with whom he traveled from Pennsylvania.  And he

5    is seen exiting the Capitol about 3:15, after spending

6    approximately eight minutes inside the building.

7         He then shared with his acquaintances photos he

8    took inside the Capitol, including photos that showed some

9    of the chaos, and, certainly, some of the destruction caused

10   by his fellow rioters inside the Capitol.

11        According to the defendant, he did not travel to

12   D.C. with criminal intent; he went to protest.  And when

13   other participants grew in hostility, he retreated from the

14   scene and went home.  But his deliberate, unlawful entry

15   into the Capitol Building, after seeing the chaos, the

16   destruction -- it went far beyond a protest, and clearly was

17   engaging in criminal conduct.

18        The nature and circumstances of the offense and

19   the need for the sentence to reflect the seriousness of the

20   offense and promote respect for the law and our democratic

21   norms would generally favor a custodial sentence.  He knew

22   he was not permitted in the Capitol Building when he went

23   there.  And even though his conduct was not physically

24   engaging in violence, either against law enforcement

25   officers there or destruction of parts of the building, put

1    him in a less troublesome category than some other

2    aggressive members of the mob that day who actually did

3    engage in more aggressive conduct both towards law

4    enforcement and destructive conduct towards the building

5    itself.

6         I do take into account that he turned himself in;

7    and he now admits that he was ashamed of being part of

8    January 6th.

9         Yet three aspects of Mr. Stenz's conduct and the

10   circumstances of his offense conduct are more troubling and

11   aggravating, as the government has said, than other

12   defendants facing this petty offense charge.

13        First, he says he is remorseful and understands

14   the gravity of what happened.  He says he doesn't remember

15   the full name of the person he traveled with.  I find that

16   very hard to believe.

17        THE DEFENDANT:  I still don't, Your Honor.

18        THE COURT:  Second, he went into the private

19   office -- this is very troubling.  He went into the private

20   office of a senator not just for a split second, not just to

21   glance in.  He went inside that office for four minutes; he

22   rummaged about.  He took a picture; looked at books -- and

23   that office was trashed.

24        Even if this defendant didn't do the actual

25   trashing, he certainly contributed with his presence to the

1    anything-goes atmosphere of this mob on January 6 inside the

2    Capitol.

3         Third -- and also very troubling -- is he chose to

4    engage in the unlawful conduct while facing state charges in

5    Pennsylvania for attempting to buy a firearm with false

6    statements on the documentation he submitted to buy that

7    firearm and lied about his prior criminal history.

8         In sum, his decision to join the mob and

9    unlawfully enter the Capitol as he faced unresolved criminal

10    charges in another jurisdiction and his entry into a

11    senator's office while inside the Capitol distinguish

12    this -- his conduct as more serious, even if still

13    nonviolent, than other defendants convicted of this petty

14    offense due to their criminal actions on January 6th.

15         Regarding his history and characteristics, he has

16    five prior misdemeanor convictions extending for almost

17    three decades, beginning in 1990 when he was 19 years old,

18    until his most recent conviction just last year, on

19    January 21, 2021, shortly after his conduct on January 6th,

20    here in Washington, D.C.

21         His other convictions stem from guilty pleas to

22    misdemeanor violations, as we've already discussed during

23    the course of this hearing:  A DUI; possession of marijuana;

24    some kind of falsification or filing a false report with law

25    enforcement; stalking and harassment; and obstruction of

1    emergency services; and, in all of those prior convictions,

2    he received probation sentences except for one where there

3    is some discrepancy in the record where the defendant says

4    he only was -- served one week in prison; the documentation

5    indicates that he served one year.  But whether it's one

6    year or one week, I would credit the defendant understanding

7    how long he spent in prison before, so I would credit that

8    over some documentation.

9          He was given probationary terms that apparently

10   didn't make sufficient impact to make him pause when he

11   opted -- to quote him -- to cross the line again on

12   January 6th.

13         All of these interactions with the criminal

14   justice system that he has already had -- when a sentencing

15   judge looks at them, thinks that the penalty needs to be

16   stiffer than he has received in the past to ensure that he

17   understands the lesson this time around.

18         He certainly has been in a stable relationship.

19   He has had a long-term marriage; he has raised three

20   children who all seem successful.  He has had a substance

21   abuse problem in the past.  He admitted to vaping THC daily

22   and says that he was not high on January 6th; although the

23   video shows him vaping -- but says that he was smoking

24   cigarettes that day.

25         He has received his GED.  He has successfully

1    completed his commercial driver's license.  And he has been

2    employed full-time as a driver and laborer for a paving

3    company in Pennsylvania; that's all to his credit.

4         In addition, unlike other January 6th defendants,

5    he didn't post pictures of his time in the Capitol Building

6    on social media.  He doesn't appear to have boasted about

7    his criminal conduct on social media or in the news to

8    incite others to engage in similar kinds of political

9    violence.  And he has, after that faithful day, not

10   advocated for the overturning of the legitimate democratic

11   electoral process in this country.

12        The various letters submitted on his behalf show

13   that he has the support of his family, his friends, his

14   current employer, and that's also to his credit.

15        It is -- they say that he was devoted -- is a

16   devoted and caring member of his family; they speak of his

17   generosity and his caring personality.  And it is very

18   unfortunate that those were not behaviors at the forefront

19   on January 6th.

20        So the need for the sentence imposed to deter

21   criminal behavior and protect the public from further crimes

22   of the defendant are critical considerations for every

23   sentencing judge.  As to this factor, the seriousness of the

24   criminal conduct highlights the need for deterrence of both

25   others who might consider engaging in this kind of conduct,

1    and also to deter the defendant for numerous individuals

2    like Mr. Stenz who say they got caught up in the fervor of

3    the crowd.

4            It's necessary for this Court to make clear that

5    lack of forethought, getting caught up in the moment,

6    following a crowd, does not create absolution for criminal

7    activity, especially when this kind of participation in a

8    mob facilitates and amplifies the blatant and egregious

9    criminal conduct of others.

10           When determining what sentence to impose, the

11   importance of deterring future malcontents from disrupting

12   the peaceful transition of power after an election weighs

13   heavily in the Court's considerations.

14           There are consequences to going along with a crowd

15   when the crowd is engaging in clear and obvious chaotic

16   criminal activity that is designed, intended to disrupt the

17   peaceful transition of power after an election.

18           Specific deterrence is a real concern in this case

19   in light of the defendant's criminal history for prior

20   criminal conduct for which he generally received

21   probationary sentences; but nonetheless he got involved in

22   criminal conduct again on January 6th even while he was

23   facing criminal charges in another jurisdiction.

24           Without serious consequences for his actions here,

25   he has every reason to believe he will continue to act first

1    and regret later once he is caught and forced to face the

2    consequences.  Consideration of this factor favors

3    imposition of a brief period of incarceration to promote

4    respect for the law and deter the defendant from additional

5    criminal activity.

6         Regarding the types of sentences available,

7    Mr. Stenz was convicted of a petty offense, a Class B

8    misdemeanor, that is subject to a maximum term of

9    imprisonment of 6 months and up to 5 years' probation,

10   pursuant to 18 U.S.C. Section 3561(c)(2).

11        The government has argued that both a term of

12   probation and a term of imprisonment may be imposed for a

13   petty offense based on the government's statutory

14   construction of 18 U.S.C. Section 3561(a)(3).  The defense

15   counsel has not addressed at all -- is silent in his

16   sentencing memo -- about the propriety of a split sentence

17   for a petty offense.

18        As an alternative to a split sentence, the

19   government requests the Court impose incarceration for a

20   brief interval as a condition of probation and notes that a

21   sentence of up to 2 weeks' imprisonment served in one

22   continuous term, followed by a period of probation, is

23   permissible; and that is what the Court intends to do.

24        As I have already said in my conversation with

25   Mr. Pearce from the Department of Justice, it is unnecessary

1     to decide the permissibility of a split sentence in this

2     case since a special condition of probation can be set.

3          Regarding the need to avoid unwarranted sentencing

4     disparities, the defendant requests only a probationary

5     period, arguing that he is not as culpable as the more

6     nefarious participants who had actually led a violent siege

7     on the U.S. Capitol, including the defense memorandum at

8     page 4; and that, sort of, suggests that a custodial

9     sentence here would be an unwarranted sentencing disparity.

10         I certainly recognize that a range of sentences,

11    both probationary and custodial, have been imposed on

12    January 6th defendants convicted of the same petty offense

13    misdemeanor.  And given the specific offense conduct of

14    Mr. Stenz, including the circumstances of his criminal

15    history, I do find that a lengthy period of probation would

16    be appropriate to ensure he is subject to supervision for a

17    period of at least 3 years, taking us through the next two

18    election cycles, so he does not again engage in political

19    violence that occurred on January 6th.  And due to the

20    aggravating factors of his offense conduct already noted,

21    his entry into a senator's office while inside the Capitol,

22    his criminal history, his decision to engage in criminal

23    conduct on January 6th while awaiting judgment on criminal

24    charges pending in Pennsylvania, I do believe that special

25    conditions of -- with a short period of -- a 14-day period

 1    of confinement in the custody of the Bureau of Prisons as an

 2    alternative to a sentence of imprisonment is necessary here.

 3            So based on my consideration of these and other

 4    factors, I will now state the sentence to be imposed.

 5            Pursuant to the Sentencing Reform Act of 1984 and

 6    in consideration of the provisions of 18 U.S.C. Section

 7    3553(a), it is the judgment of the Court that you, Brian E.

 8    Stenz, are hereby sentenced to a term of 36 months, 3 years

 9    of probation, on Count 4 of the information, with special

10    conditions of 14 days' confinement, and 2 months of home

11    detention.

12            In addition, you are ordered to pay a special

13    assessment of $10, in accordance with 18 U.S.C. Section

14    3013.

15            The Court authorizes supervision and jurisdiction

16    of this case to be transferred to the U.S. District Court

17    for the Eastern District of Pennsylvania.

18            While on supervision, you shall abide by the

19    following mandatory conditions, as well as the standard

20    conditions of supervision, which are imposed to establish

21    the basic expectations for your conduct while on

22    supervision.

23            The mandatory conditions include:  One, you must

24    not commit another federal, state, or local crime.  Two, you

25    must not unlawfully possess a controlled substance.  Three,

1    you must refrain from any unlawful use of a controlled

2    substance; you must submit to one drug test within 15 days

3    of placement on supervision, and at least two periodic drug

4    tests thereafter as determined by the Court.  Four, you must

5    make restitution in accordance with your plea agreement in

6    accordance with 18 U.S.C. Section 30 -- 3663, or any other

7    statute authorizing a sentence of restitution.

8          You are ordered to make restitution to the

9    Architect of the Capitol in the amount of $500.  The Court

10   determines that you do not have the ability to pay interest

11   and, therefore, waives any interest or penalties that may

12   accrue on the balance.

13         You shall comply with the following special

14   conditions as to intermittent confinement.  Pursuant to

15   18 U.S.C. Section 3563(b)(10), you must serve a total of

16   14 days of intermittent confinement.  The intermittent

17   confinement shall be served for 14 consecutive days at a

18   facility designated by the Bureau of Prisons.  You must

19   follow the rules and regulations of the facility in which

20   you are designated.

21         You must also submit to home detention for a

22   period of two months, as soon as practicable, and comply

23   with the location monitoring program requirement as directed

24   by the U.S. Probation Office.  You will be restricted to

25   your residence at all times except for:  employment;

1    education; religious services; medical; substance abuse; and

2    mental health treatment; court-ordered obligations, and any

3    other -- and any other kind specifically authorized by the

4    U.S. Probation Office.

5         The location monitoring technology is at the

6    discretion of the U.S. Probation Office; you must pay the

7    cost of monitoring.

8         You must submit to substance abuse testing to

9    determine if you have used a prohibited substance.  You must

10   not attempt to obstruct or tamper with the testing methods.

11        You must provide the probation officer access to

12   any requested financial information and authorize the

13   release of any financial information.  The probation office

14   may share financial information with the U.S. Attorney's

15   Office.

16        Having assessed the defendant's ability to pay,

17   payment of the total criminal monetary penalty is due;

18   payment in equal installments of $100 to commence 30 days

19   after the date of this judgment.

20        You are also ordered to pay a fine in the amount

21   of $2500.  The Court determined you do not have the ability

22   to pay interest and, therefore, waives any interest or

23   penalties that may accrue on the balance.

24        Restitution payments shall be made to the Clerk of

25   the Court of the U.S. District Court for the District of

1    Columbia for disbursement to the following victims:

2    Architect of the Capitol, Office of the Chief Financial

3    Officer, attention Kathy Sherrill, CPA, Ford House Office

4    Building, Room H2-205B, Washington, D.C. 20515, in the

5    restitution amount of $500.

6          The financial obligations are immediately payable

7    to the Clerk of the Court for the U.S. District Court, 333

8    Constitution Avenue, Northwest, Washington, D.C. 20001.

9          Within 30 days of any change of address, you shall

10   notify the Clerk of the Court of the change until such time

11   as the financial obligation is paid in full.

12         The probation office shall release the presentence

13   investigation report to all appropriate agencies which

14   includes the U.S. Probation Office in the approved district

15   of residence in order to execute the sentence of the Court.

16         Pursuant to 18 U.S.C. Section 3742, you have a

17   right to appeal the sentence imposed by the Court if the

18   period of imprisonment is longer than the statutory maximum.

19   If you choose to appeal, you must file any appeal within 14

20   days after the Court enters judgment.

21         As defined in 28 U.S.C. Section 2255, you also

22   have the right to challenge the conviction entered or

23   sentence imposed if new and currently unavailable

24   information becomes available to you or on a claim you

25   received ineffective assistance of counsel in entering a

1    plea of guilty to the offense of conviction or in connection

2    with sentencing.  If you are unable to afford the cost of an

3    appeal, you may request permission from the Court to file an

4    appeal without cost to you.

5           Are there any objections to the sentence imposed

6    not already noted on the record from the government?

7           MS. ALBINSON:  No, Your Honor.

8           THE COURT:  And, Mr. Marrone?

9           MR. MARRONE:  No, Your Honor.

10          THE COURT:  You may be seated.

11          THE DEFENDANT:  Thank you, Your Honor.

12          THE COURT:  Does the government have a motion to

13   dismiss to the open counts in the information, 1 through 3?

14          MS. ALBINSON:  Yes, Your Honor.  We would move to

15   dismiss those counts at this time.

16          THE COURT:  All right.  That motion is granted;

17   those open counts are dismissed.

18          Is there anything further from the government

19   today?

20          MS. ALBINSON:  No, Your Honor.  Thank you.

21          THE COURT:  Mr. Marrone?

22          MR. MARRONE:  No, Your Honor.

23          THE COURT:  All right.  You are all excused.

24          THE DEFENDANT:  Thank you, Your Honor.

25          THE COURT:  Thank you, Mr. Stenz.
            (Whereupon, the proceeding concludes, 10:58 a.m.)

## CERTIFICATE

I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.

Dated this 21st day of February, 2022

/s/ Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter